195 N.J. Super. 444 (1984)
480 A.2d 223
FRANCINE LAZORICK AND FRANK AND ANN LAZORICK, HER PARENTS, PLAINTIFFS-RESPONDENTS,
v.
J. DUFF BROWN, M.D., KURT MANRODT, M.D., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1984.
Decided August 31, 1984.
*446 Before Judges BOTTER, PRESSLER and O'BRIEN.
Craig S. Combs argued the cause for appellants (Giblin, Combs & Cooney, attorneys; Craig S. Combs and Thomas F. Quinn, on the brief).
Arthur I. Miltz argued the cause for respondents (Kronisch and Schkeeper, attorneys; Arthur I. Miltz, on the brief).
The opinion of the court was delivered by BOTTER, P.J.A.D.
This is a medical malpractice action against two doctors, Dr. Brown and Dr. Manrodt. After being treated by them plaintiff Francine Lazorick came under the care of Dr. Galton and Dr. Needle. The issue on this appeal is whether defendants should be barred from calling Dr. Galton and Dr. Needle as witnesses because defense counsel spoke with them and received reports *447 from them without their patient's consent. Because of this conduct the trial judge ordered that neither Dr. Galton nor Dr. Needle would be allowed to testify for defendants at trial as a fact or expert witness. We granted defendants leave to appeal from this order, and we now reverse.
Francine Lazorick is now 30 years of age.[1] She was treated by defendants in 1979. While the particular medical dispute does not bear significantly on the confidentiality issue in this case, we will sketch in some details as background. Plaintiff saw Dr. Manrodt on October 5, 1979. According to medical reports in the record she appeared to have an upper respiratory infection manifested by a stuffy nose, coughing, and shortness of breath. Examination revealed thick mucus in her nose and wheezing rales in both lungs. A nasal spray, cough medication and Erythromycin were prescribed. She was seen again by Dr. Manrodt on October 30 and by Dr. Brown on November 13, 1979, during Dr. Manrodt's absence. Dr. Brown prescribed Amoxicillin, a penicillin derivative. Dr. Manrodt saw her two days later and continued her on Amoxicillin, apparently until November 18. Plaintiff's condition worsened and she was seen on November 19 by an associate of Dr. Brown. Thereafter she came under the care of Dr. Galton who admitted her to the Chilton Memorial Hospital on November 20 with a diagnosis of "serum sickness reaction." She was also seen some time thereafter by Dr. Needle in consultation with Dr. Galton.
Plaintiffs contend that Francine Lazorick developed a severe systemic disease called vasculitis resulting in permanently debilitating injuries, including the loss of use of her hands except for limited purposes. They contend that this disease was a reaction to Amoxicillin which they contend should not have been prescribed and should not have been continued. Defendants contend that Amoxicillin did not cause the vasculitis. They *448 base this in part on the presence of wheezing before antibiotics were administered. Defendants' medical experts deny that plaintiff had serum sickness. They say that she had periarteritis (also referred to as vasculitis syndrome) which was manifested by symptoms, including respiratory symtoms, that preexisted the ingestion of Amoxicillin. They also deny that defendants were negligent in administering Amoxicillin to plaintiff.
Plaintiffs' answers to interrogatories did not list Dr. Galton and Dr. Needle as proposed expert witnesses. They have received reports from consulting physicians who examined various records and have expressed opinions as to the cause of Francine's condition and defendants' malpractice, but plaintiffs do not plan to produce any treating doctors as their own witnesses. Dr. Galton was listed as a treating physician for plaintiff's "current disease," but plaintiffs did not submit any report from him.
Defense counsel asked plaintiffs' attorneys to furnish written authorization for obtaining medical records from various doctors and to permit defense counsel to discuss Francine Lazorick's medical condition with those doctors. Consent was given for the medical records, but was denied as to "discussions or conversations." Defendants then moved to compel plaintiff to give such authorization, contending that plaintiffs' attorneys were free to discuss plaintiff's medical condition with treating doctors and defendants should have the same right, especially with doctors who will not be called as plaintiffs' witnesses. The trial judge denied the motion without clearly articulating the basis for his ruling. He referred to the fact that the doctors had not been asked to speak to defense counsel but apparently were willing to do so. He said he would not rule on defendants' request to compel plaintiff to sign an authorization and that he saw no need for intervention in the dispute at that time. In denying the motion he said, "I'm not saying that I might not grant it at some future time," but that he saw no basis for intervening in the dispute "at this point." Defense counsel suggested that he would arrange a meeting with the *449 doctors on notice to his adversary who could then move for a protective order. The judge gave the appearance of accepting this suggestion, so that if plaintiffs' attorneys objected and the doctors would not meet with defense counsel, the motion could be renewed. The trial judge denied the motion, giving as a reason that he had "no reasons to grant" it at that time.
Defense counsel arranged a meeting with Dr. Galton for December 2, 1982 and advised plaintiffs' attorneys by letter dated November 11 that they should move for a protective order if they thought the meeting was improper. Plaintiffs' attorneys replied that they reserved their right to object at trial to the admission of evidence from this unauthorized and inappropriate meeting with plaintiff's treating physicians. To this defense counsel replied that the purpose of the meeting was to investigate evidence, not create it. The response to this was another letter protesting the effort to turn treating physicians into witnesses against plaintiff, which plaintiffs' attorneys termed "wrong as a matter of simple fairness and justice." No motion was made for a protective order, and the meeting with Dr. Galton took place on December 2, followed by his written report stating that Amoxicillin "could have been the causative agent, but it is more likely that it was not the cause of the disease." Plaintiffs contend that this opinion conflicts with opinions expressed by Dr. Galton in the hospital records. Defendants dispute this contention. Later, without meeting with defense counsel, Dr. Needle furnished two reports expressing the opinion that it was impossible to establish that plaintiff's condition was caused by the Amoxicillin. Defendants say they are not offering Doctors Galton and Needle as expert witnesses on the standard of care exercised by defendants but solely as to their opinion as to when plaintiff's illness began and the lack of causal connection between Amoxicillin and that illness.
Plaintiffs' motion to bar the testimony of Dr. Galton and Dr. Needle was heard by a different trial judge. He expressed the view that "public policy" prohibits private interviews of physicians who treat a plaintiff, and that private interviews are not *450 "an appropriate means or method of obtaining the information" to which an adversary is entitled. He stated further: "It is not appropriate for the physician to be placed in a position of advocacy against that physician's own patient. It has a serious tendency to impair, if not destroy, a very important relationship, that between physician and patient," which could jeopardize the effectiveness of treatment and the patient's freedom of choice in seeking medical care. The trial judge concluded that deposing a doctor is preferable to private conferences or interviews because it affords the opportunity to protect the patient's interests. Therefore, he entered an order barring any testimony from Dr. Galton and Dr. Needle, apparently for defense counsel's misconduct in speaking with them.
Even if we agreed with these principles we would question the relief granted in this case because plaintiffs failed to move for a protective order when they had the opportunity to do so. Defendants' attorneys sought to have the issue resolved by motion but were rebuffed apparently because it was not clear that the doctors would not talk to them without the patient's prior approval. After plaintiffs' attorneys were advised of the scheduled meeting with Dr. Galton they should have moved to prevent the meeting from taking place. The problem plaintiffs faced is that there is nothing in the Court Rules or the law of evidence that prohibits an attorney from obtaining unprivileged information through informal discussions with a potential witness. A doctor is not required to discuss a patient's medical condition with the patient's adversary, but there is no express law that prohibits him from doing so, providing he is not disclosing privileged information. Even if defense counsel contravened some unwritten public policy, in the circumstances of this case the sanction imposed seems unfair in the light of plaintiffs' failure to seek a protective order and defendants' prior attempt to obtain a ruling on the issue. Defense counsel could have considered Dr. Galton's opinion as to the cause of plaintiff's illness extremely important in relation to early impressions recorded by him in the hospital *451 record. We understand defendants' position to be that the early diagnoses of serum sickness was proven incorrect by the course of the disease and subsequent medical findings. To utilize the diagnosis in the hospital report without permitting defendants to present Dr. Galton as a witness who could explain his prior and current opinion seems not only unfair but poses a serious evidence question as well. Notwithstanding the business record exception to the hearsay rule, Evid.R. 63(13), expert opinions recorded in business records by a declarant who is not available for cross-examination may be excluded as substantive proof if the opinions relate to "diagnoses of complex medical conditions difficult to determine or substantiate." Gunter v. Fischer Scientific American, 193 N.J. Super. 688, 694 (App.Div. 1984); cf. State v. Martorelli, 136 N.J. Super. 449, 453-454 (App.Div. 1975), cert. den. 69 N.J. 445 (1976).
The doctor-patient privilege was created in this state for the first time by statute enacted in 1968. N.J.S.A. 2A:84A-22.1 et seq. It protects confidential communications between a physician and patient, including information obtained by an examination of the patient. N.J.S.A. 2A:84A-22.1. The patient is given the privilege to refuse to disclose and to prevent a witness from disclosing such confidential communications in civil actions and in other proceedings. N.J.S.A. 2A:84A-22.2. Before this privilege was enacted a doctor could be compelled to testify to confidential communications with a patient. See Hague v. Williams, 37 N.J. 328, 334-335 (1962). However, in the absence of legal compulsion, doctors were ethically restrained from violating the privacy of their patients by disclosing confidential information, and this precept is part of the Oath of Hippocrates. Id. at 332, 335.
Prior to the enactment of the doctor-patient privilege, the state's policy favored exposure of information obtained by a doctor in his professional relationship with his patient "when it is relevant to the resolution of litigation." Id. at 335. Even without testimonial compulsion, Hague v. Williams held that information concerning a patient's medical condition could be *452 disclosed to someone having a legitimate interest in the subject "where ... the physical condition of the patient is made an element of a claim." Id. at 336. In Hague v. Williams the court held that a doctor could disclose the medical condition of his patient to an insurance company against whom a claim was made for benefits because of the patient's death. The court said: "While that claim had not yet been pressed to litigation, the same policy which during litigation permits, even demands, disclosure of information acquired during the course of the physician-patient relationship allows the disclosure thereof to the person against whom the claim is made, when recovery is sought prior to or without suit. At this point the public interest in an honest and just result assumes dominance over the individual's right of non-disclosure." Ibid.
In enacting the doctor-patient privilege the Legislature has continued the policy of allowing disclosure when a patient's medical condition is the subject of legal action. N.J.S.A. 2A:84A-22.4 provides:
There is no privilege under this act in an action in which the condition of the patient is an element or factor of the claim or defense of the patient or of any party claiming through or under the patient or claiming as a beneficiary of the patient through a contract to which the patient is or was a party or under which the patient is or was insured.
The trial judge recognized that medical information obtained by Drs. Galton and Needle in treating plaintiff was not privileged because this action put her condition and its cause in dispute. However, he held that "public policy" prevented defendants' attorneys from speaking with these doctors. If allowed to stand the ruling would mean that the doctors must be deposed under oath before defendants' attorneys can discover what they have to say. At the same time plaintiffs' attorneys could freely speak with the doctors without defendants' attorneys being present.
There are a number of decisions supporting this position. Garner v. Ford Motor Co., 61 F.R.D. 22 (D.Alaska 1973); Wenninger v. Muesing, 307 Minn. 405, 240 N.W.2d 333 (Sup. Ct. 1976); JAAP v. District Court of Eighth Judicial Dist., 623 *453 P.2d 1389 (Sup.Ct.Mont. 1981); Cwick v. Rochester, 54 A.D.2d 1078, 388 N.Y.S.2d 753 (1976); Alexander v. Knight, 197 Pa. Super. 79, 177 A.2d 142 (Super.Ct. 1962). The reasons given for not entering an order permitting private conferences with a patient's doctor are that the rules of procedure do not provide for such means of discovery (Garner; Wenninger; JAAP; Cwick), the use of conventional discovery procedures protects against disclosure of irrelevant medical information and "allays a patient's fears that his doctor may be disclosing personal confidences" (Wenninger v. Muesing, 240 N.W.2d at 337), and a doctor owes a patient "total care," which includes the duty to aid the patient in litigation and "to refuse affirmative assistance to the patient's antagonist in litigation" (Alexander, 177 A.2d at 146).
Cases upholding the right to have a private conference with a litigant's treating doctor are Doe v. Eli Lilly & Co., Inc., 99 F.R.D. 126 (D.D.C. 1983); Trans-World Investments v. Drobny, 554 P.2d 1148 (Sup.Ct.Alaska 1976); Gailitis v. Bassett, 5 Mich. App. 382, 146 N.W.2d 708 (Ct.App. 1966). In Trans-World Investments plaintiff sued for personal injuries arising out of a motor vehicle accident. The Supreme Court of Alaska held that the filing of the action constituted a waiver of the physician-patient privilege. The court noted that disclosure of the patient's prior medical condition was essential to the proper evaluation of the claim. It held that informal discovery methods, including private conferences with plaintiff's treating physicians, were not precluded by formal discovery rules of procedure. The court said that informal procedures "are to be encouraged, for they facilitate early evaluation and settlement of cases, with a resulting decrease in litigation costs, and represent further the wise application of judicial resources." 554 P.2d at 1152.
In Doe v. Eli Lilly & Co., Inc., plaintiffs sued for injuries allegedly caused by a drug manufactured by defendant. Thus, the doctor-patient privilege was waived. Defendant moved to compel plaintiffs to authorize various doctors to release medical information acquired in a privileged capacity. Plaintiffs refused *454 to consent to private interviews with their doctors contending that defendant would use that opportunity to influence the doctors' future testimony. In ordering plaintiffs to execute unrestricted authorizations for the release of medical data, the court said:
As a general proposition, however, no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance. See International Business Machines Corp. v. Edelstein, 526 F.2d 37, 41-44 (2d Cir.1975); Gregory v. United States, 369 F.2d 185, 187-88 (D.C. Cir.1966); Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 551 (D.C. 1981); 8 J. Wigmore, Evidence § 2192 (McNaughton rev.ed. 1961). Even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him on that ground alone. Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows if other appropriate conditions the witness alone may impose are satisfied, e.g., compensation for his time and expertise or payment of reasonable expenses involved, and while the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the ex parte interview of a witness who is willing to speak. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see International Business Machines Corp. v. Edelstein, 526 F.2d at 43-44; cf. Gregory v. United States, 369 F.2d at 187-88; Trans-World Investments v. Drobny, 554 P.2d 1148, 1151-52 (Alaska 1976).
* * * * * * * *
The inchoate threat implicit in refusing or qualifying permission to speak to a witness in possession of privileged information operates to intimidate the witness, who is then placed in the position of withholding or divulging what he knows at his peril, and is itself a species of improper influence. It also enables the party so wielding the privilege to monitor his adversary's progress in preparing his case by his presence on each occasion such information is revealed while his own preparation is under no such scrutiny. [99 F.R.D. at 128-129]
The discovery rules in personal injury and other actions, such as R. 4:14 (depositions upon oral examination), R. 4:14-9(e) (videotaped depositions of a treating physician or expert witness), and R. 4:19 (physical and mental examination), were never conceived as exclusive modes of discovery, investigation and preparation for trial. Indeed, the provision for the admission at trial of videotaped depositions of a treating physician or *455 expert witness, whether or not such witness is available to testify, reflects the need to use less costly and time consuming means of producing evidence. It is not only costly to all parties to litigation but it may be impractical and inefficient to produce all treating doctors for depositions without knowing in advance whether their testimony will be useful or helpful in resolving disputed issues. Moreover, medical witnesses may need time to review extensive hospital records, reports of other doctors, and medical authorities and to become familiar with the crucial medical issues in the case. It is not only unwise for a party to require an expert witness to testify without the opportunity for such preparation, but it may also be unfair to the witness. The opinions which prohibit an adverse party to meet privately with a treating doctor reflect the fear of undue influence. But it may also impede the goal of discovery to compel a doctor to appear for depositions without an adequate opportunity to understand the nature of the controversy and to prepare himself for examination by attorneys in the case. It may be noted, in passing, that the doctors' reports in this case show that all the material relied upon for the doctors' conclusions, namely, the course of treatment of plaintiff and her prior medical history, had been fully disclosed. The conclusions expressed by Dr. Galton and Dr. Needle were not based upon any information that was unavailable to plaintiffs' medical experts. The dispute involves an interpretation of plaintiff's symptoms and their cause. In this case, although Dr. Galton and Dr. Needle were treating physicians, they may not have been in a superior position to evaluate plaintiff's prior history and the symptoms exhibited by her when seen by defendants. However, Dr. Galton's explanation of his early diagnosis placed in the hospital records may be significant, particularly if later events changed his opinion as to the nature of plaintiff's illness and its cause.
Plaintiffs contend that Dr. Galton and Dr. Needle owe a duty of loyalty to their patient and should not go over to defendants' camp. The right given to defendants to interview these doctors does not oblige them to cooperate with defendants. *456 On the other hand, the doctors may sympathize with another doctor who they believe has been unjustly accused of malpractice. They may feel an obligation to see justice done as they view it. In this case plaintiffs contend that Dr. Galton has close ties to defendants. If so, this may make his testimony suspect. But motive and interest go to the weight to be given to testimony, not to its admissibility. See Evid.R. 20. Evid.R. 7(e) provides that, except for privileges accorded by law, "no person has a privilege that another shall not be a witness or shall not disclose any matter...."
The policy of the law is to allow all competent, relevant evidence to be produced, subject only to a limited number of privileges. See Evid.R. 7. As stated in Hague v. Williams, 37 N.J. at 335, "society has a right to testimony and ... all privileges of exemption from this duty are exceptional." We do a disservice to these principles by creating restrictions on the right of parties to talk to potential witnesses. The weighing of policy has been done by the Legislature in the definition of privileges and the terms on which they are lost or surrendered. To speculate about sinister motives of attorneys and treating doctors and to establish additional limitations on the right to seek out evidence as a matter of policy would do mischief to the adversary system. It would be a mistake to say that all testimony of a treating doctor is so tainted because he conversed with his patient's adversary that his testimony must be excluded. Such a rule would inevitably impede the search for truth. Nor can we say that the justice system should pay this price so that the doctor-patient relationship will not be bruised. Defendants ought to have the same right of access as plaintiffs have to potential witnesses, even if they are treating physicians.
Accordingly, we hold that plaintiffs cannot prevent defendants and their attorneys from speaking privately with plaintiff's other treating physicians about any matter that is not privileged. To allay the concerns of a doctor who may be *457 interviewed by defense counsel, a plaintiff should be required to sign a document which authorizes the release of such unprivileged information. As stated above, the authority to release information to a patient's adversary does not place any obligation upon treating doctors to cooperate with that adversary. A doctor need not serve voluntarily as an expert for his patient's adversary in litigation. Except for obligations to their patients, doctors may refuse to divulge any information or to give any opinion unless compelled to do so by judicial process.
We reverse the order entered in the trial court and remand the case for further proceedings consistent with this opinion.
NOTES
[1] Francine Lazorick's parents asserted a claim for the loss of her services and for past and future medical expenses incurred by them on her behalf. When used in the singular in this opinion plaintiff refers to Francine Lazorick alone.