990 A.2d 685 (2010)
412 N.J. Super. 374
Catherine Kennedy CARCHIDI, as parent and guardian of Hunter Carchidi DuBois, Plaintiff-Respondent,
v.
Michelle A. IAVICOLI, M.D., Ricardo Caraballo, M.D., Robin L. Perry, M.D., Richard L. Fischer, M.D., Dr. Karin Witt, Susan I. Kaufman, D.O., Dr. Stacie MacDonald, Natalie Franzblau, M.D., Brian Leve, M.D., Defendants-Respondents, and
The Cooper Hospital/University Medical Center, the Cooper Health System, and Women's Health Associates and/or Cooper OB-GYN, Defendants-Appellants.
DOCKET NO. A-4986-08T3.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 2009.
Decided March 24, 2010.
*686 Walter F. Kawalec, III, Cherry Hill, argued the cause for appellants (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys, Cherry Hill; Stephen A. Ryan of the Pennsylvania bar, King of Prussia, PA, admitted pro hac vice, Mr. Kawalec and David J. Krolikowski, on the briefs, King of Prussia, PA).
Jeffrey M. Kornblau, Horsham, PA, argued the cause for respondent Catherine Kennedy Carchidi (Kornblau & Kornblau, P.C., attorneys, Jenkintown, PA; Mr. Kornblau and Lynn Sare Kornblau, on the brief, Jenkintown, PA).
Mayfield, Turner, O'Mara, Donnelley & McBride, for respondents Dr. Stacie MacDonald, Dr. Karin Witt and Brian Leve, M.D., rely on the brief of appellants.
Stahl & DeLaurentis, P.C., Voorhees, for respondent Susan I. Kaufman, D.O., rely on the brief of appellants.
Parker McCay, Marlton, for respondents Michelle A. Iavicoli, M.D., Ricardo Caraballo, M.D. and Natalie Franzblau, M.D., rely on the brief of appellants.
Respondents Richard L. Fischer, M.D. and Robin L. Perry, M.D. have not filed briefs.
Britcher, Leone & Roth, L.L.C., Glen Rock, for amicus curiae New Jersey Association for Justice (E. Drew Britcher and Jennifer Widmann Garcia, on the brief).
Hoagland, Longo, Moran, Dunst & Doukas, LLP, New Brunswick, for amicus curiae New Jersey Hospital Association (Thomas B. Leyhane, of counsel and on the brief).
Before Judges LISA, BAXTER and COBURN.
The opinion of the court was delivered by
LISA, P.J.A.D.
We granted defendant, Cooper Health Systems (Cooper), leave to appeal two interlocutory orders in this medical malpractice case that (1) precluded Cooper from utilizing two particular physicians as causation experts, and (2) precluded one of those physicians from examining plaintiff.[1] The two physicians never treated plaintiff but were members of the physician group that has regularly treated plaintiff since 2001, when he was one year old, for the injuries resulting from the alleged malpractice *687 at the time of his delivery and birth. For the reasons that follow, we affirm.
Plaintiff was born in 2000, nearly three months prematurely. Plaintiff suffers from serious and complex neurological conditions, including cerebral palsy with right hemiparesis, autism, epilepsy and bilateral deafness. Plaintiff contends that these conditions were caused by the negligence of doctors at Cooper, which included the failure to administer prenatal steroids and take other appropriate measures to prevent or delay plaintiff's preterm delivery. Plaintiff contends that appropriate care would have prevented him from sustaining an intraventricular hemorrhage, resulting in brain damage. Defendants deny any negligence. They also deny that plaintiff suffered an intraventricular hemorrhage. They contend the cause of plaintiff's brain damage was a left middle cerebral artery infarction, which was brought on by an infection (chorioamnionitis) in the mother and her premature rupture of membranes precipitating premature delivery, all of which could not have been avoided.
Shortly after his birth, plaintiff treated with the neurology division at duPont Hospital for Children in Wilmington, Delaware. Since 2001, he has treated regularly and continuously with the neurology group at Children's Hospital of Philadelphia (CHOP).[2] Since 2001, plaintiff has primarily treated with Dr. Dennis J. Dlugos, a member of that group, and he has seen other physicians and nurse practitioners in the group from time to time. Plaintiff's parents chose CHOP and this group because of the outstanding qualifications of the hospital and group and the proximity of CHOP to their home in South Jersey. Having this facility and group nearby for emergency situations, with plaintiff's records available and health care providers familiar with his situation was also a selection factor. Plaintiff's mother has taken plaintiff to CHOP in emergency situations since 2005, and in the last year and one half the frequency of emergency visits has increased due to an escalation in plaintiff's neurological problems.
Plaintiff's mother, who is a nurse at CHOP, knows that her son's care depends on the free exchange of ideas between the physicians comprising the neurology group, and she relies on that free exchange to assure high quality care for her son. The neurology group consists of about twenty-two physicians.
On two occasions, in 2003 and 2009, plaintiff underwent MRI studies at CHOP, which were interpreted by members of the neuroradiology group. Further studies are anticipated.
As the deadline for serving expert reports approached, Cooper sought to have plaintiff examined by Dr. Robert R. Clancy, a senior member of the CHOP neurology group. Plaintiff's counsel refused. Cooper moved to compel the examination. The motion was denied.
During this time frame, Cooper also served on plaintiff expert reports from Dr. Clancy and Dr. Robert A. Zimmerman, a senior physician in CHOP's neuroradiology group. Dr. Clancy's report included an opinion that the Cooper doctors did not breach the applicable standard of care. He also gave his opinion as to causation of plaintiff's injuries, which was along the lines we previously described as Cooper's position. Dr. Zimmerman's report set forth his review and interpretation of ten neuroimaging studies. The first study was *688 conducted one day after plaintiff's birth and the others over the next two months. He concluded that the study conducted on the day after birth was normal but the study conducted three days later revealed an acute left middle cerebral artery infarction, and that the subsequent studies "show the evolution of that injury." This supported Dr. Clancy's causation opinion.
Cooper obtained the reports from Drs. Clancy and Zimmerman without plaintiff's permission or knowledge. Plaintiff moved to bar Cooper from using Drs. Clancy and Zimmerman as experts. Cooper advised the court and plaintiff that it did not intend to elicit from Dr. Clancy his opinion that the Cooper doctors did not breach the applicable standard of care. Cooper stated its intention to use both of these witnesses only to render opinions on causation, presumably adverse to plaintiff.
The court granted plaintiff's motion. Considering the rationale and holdings in Stigliano v. Connaught Laboratories, Inc., 140 N.J. 305, 658 A.2d 715 (1995), and other cases, the court reasoned that Drs. Clancy and Zimmerman were not actual treating physicians and could therefore not be used by the defense to give adverse causation testimony based on knowledge and information obtained through treatment. The court further reasoned that because of their membership in plaintiff's treatment group, it would be improper to allow the defense to use them as experts against plaintiff. The court found it significant that each of these treatment groups held itself out as a team. The court was also influenced by the senior status of Drs. Clancy and Zimmerman, who were or had been chairs or vice-chairs with supervisory or managerial authority over other team members and who provided training for junior team members.
Both sides agree that the issue presented is a novel one. Each argues that the other wants to have it both ways. Cooper says if the doctors are deemed treating physicians, the applicable precedents in this jurisdiction allow them to give adverse causation testimony; if they are not deemed treating physicians, there is nothing to prohibit them from being used as experts. Thus, Cooper argues that under one rationale or the other, their causation testimony must be allowed. Plaintiff says because the doctors are not treating physicians they cannot be allowed to give adverse causation testimony under the Stigliano rationale; and, although they are not treating physicians, their membership in plaintiff's treatment group should preclude them from serving as experts against a patient of their group to avoid unwarranted interference with the physician-patient relationship and unwarranted prejudice to plaintiff at trial. For either reason, plaintiff urges barring the testimony.
We resolve the conundrum by analyzing the nature of the physician-patient privilege, the extent of the waiver of the privilege upon the filing of a lawsuit placing at issue plaintiff's medical condition, and the legitimate interests of the respective parties as well as the interest of the public and the judicial system in ascertaining the truth. In doing so, we come down on the side of plaintiff.
The physician-patient privilege generally protects from disclosure confidential information transmitted between a physician and patient. N.J.S.A. 2A:84A-22.1, -22.2; N.J.R.E. 506(a), (b). For these purposes a "patient" is one who, for the sole purpose of treatment or diagnosis preliminary to treatment of his or her physical or mental condition "consults a physician, or submits to an examination by a physician." N.J.S.A. 2A:84A-22.1; N.J.R.E. 506(a). However, a patient who brings an action in which his or her condition is an element or factor, waives the privilege. N.J.S.A. *689 2A:84A-22.4; N.J.R.E. 506(d); Stigliano, supra, 140 N.J. at 312, 658 A.2d 715.
Plaintiff consulted Dr. Dlugos and submitted to examination by him solely for treatment and diagnosis preliminary to treatment. Dr. Dlugos is a treating physician within the meaning of this rule. He can be compelled to testify about facts known to him based on information received from plaintiff in the course of treatment. It is well settled that such factual information includes diagnosis, treatment and prognosis. Stigliano, supra, 140 N.J. at 312, 658 A.2d 715; Spedick v. Murphy, 266 N.J.Super. 573, 592, 630 A.2d 355 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993).
In Stigliano, the Court considered the use by the defense of causation testimony by three physicians plaintiff had consulted for diagnosis and potential treatment of a seizure disorder, which plaintiff contended was caused by a vaccine. Stigliano, supra, 140 N.J. at 308, 658 A.2d 715. The three doctors opined that the vaccine was not the cause of the seizure disorder. Ibid. In this court's opinion in Stigliano, we explained that the opinions of those three doctors on causation "were not unrelated to the treatment, unnecessary, volunteered or unsolicited" and that "management of a seizure disorder requires assessment of its nature, severity and cause." Stigliano v. Connaught Labs., Inc., 270 N.J.Super. 373, 378, 637 A.2d 223 (App.Div.1994), aff'd, 140 N.J. 305, 658 A.2d 715 (1995). We therefore saw "no reason to distinguish the doctors' testimony as to causation and their testimony as to diagnoses and prognoses" because "[a]ll arise out of and are inextricably linked to [the plaintiff]'s treatment." Id. at 379, 637 A.2d 223. The Supreme Court agreed that the scope of unprivileged factual information available from a treating physician should include causation. The Court explained it this way:
Although the treating doctors are doubtless "experts," in this case they are more accurately fact witnesses. Their testimony relates to their diagnosis and treatment of the infant plaintiff. In this context, moreover, the characterization of the treating doctors' testimony as "fact" or "opinion" creates an artificial distinction. A determination of causation partakes of both fact and opinion. The critical point is that the treating doctors to treat their patients must determine the cause of a disease, whether that determination is characterized as fact or opinion.
As fact witnesses, the treating doctors may testify about their diagnosis and treatment of [the infant plaintiff]'s disorder, including their determination of that disorder's cause. Their testimony about the likely and unlikely causes of [the infant plaintiff]'s seizure disorder is factual information, albeit in the form of opinion.
[Stigliano, supra, 140 N.J. at 314, 658 A.2d 715.]
See also Lazorick v. Brown, 195 N.J.Super. 444, 449-51, 480 A.2d 223 (App.Div. 1984) (illustrating the close relationship between diagnosis, treatment, and determination of cause, noting a possible change in position by treating doctors regarding causation as treatment progressed compared to the initial diagnosis, based on "the course of the disease and subsequent medical findings").
In Stigliano, the Court distinguished cases precluding medical malpractice defendants from using treating doctors to provide expert testimony relating to deviation from the standard of care. See Stigliano, supra, 140 N.J. at 314-15, 658 A.2d 715 (distinguishing Serrano v. Levitsky, 215 N.J.Super. 454, 521 A.2d 1377 (Law *690 Div.1986); Piller v. Kovarsky, 194 N.J.Super. 392, 476 A.2d 1279 (Law Div.1984)). The distinguishing factor was that Mr. and Mrs. Stigliano brought their daughter to several treating physicians for diagnosis and potential treatment. Id. at 315, 658 A.2d 715. This inherently included a request to make a determination of cause. On the contrary, in Piller and Serrano, the treating doctors were being asked about a subject not inextricably intertwined with their examination, diagnosis, treatment plan and cause determination, but about the alleged malpractice of other doctors. Ibid. In the former circumstance, the treating doctor, selected by the patient, possessed knowledge of the "fact" in issue, i.e. causation, which was gleaned from information transmitted by the patient and for which the privilege protecting confidentiality had been waived. In the latter circumstance, pure expert opinion, based on information beyond that provided by the patient in the course of diagnosis and treatment, was requested.
Like all privileges, the physician-patient privilege inhibits the search for the truth. Id. at 310, 658 A.2d 715 (citing Graham v. Gielchinsky, 126 N.J. 361, 373, 599 A.2d 149 (1991)). The "inevitable effect of allowing the privilege ... is the withholding of evidence, often of the most reliable and probative kind, from the trier of fact." Ibid. (quoting State v. Dyal, 97 N.J. 229, 237, 478 A.2d 390 (1984)). Accordingly, courts strictly construe privileges. Id. at 311, 658 A.2d 715. These fundamental principles supported the Court's conclusion in Stigliano that, although a mixture of fact and opinion, adverse causation testimony by a treating physician could be compelled once the privilege was waived. That testimony was deemed factual evidence, within the treating physician's personal knowledge, obtained by the physician at the patient's request. It should therefore not be withheld from the trier of fact. To do otherwise would have "`the awkward consequence of effectively frustrating discovery on a central issue of the case.'" Ibid. (quoting McCormick, Handbook of the Law of Evidence § 103 at 384 (4th ed. 1992)).
This analysis regarding factual evidence possessed by a treating doctor loses its efficacy with respect to evidence developed solely for use in the litigation. Drs. Clancy and Zimmerman never treated plaintiff, nor did plaintiff ever consult them or submit to examination by them for the purpose of treatment or diagnosis preliminary to treatment. They did not arrive at a determination of the cause of plaintiff's injuries in that manner. Therefore, the Stigliano analysis cannot authorize their proffered testimony as "treating doctors." They were strangers to plaintiff and strangers to the litigation until contacted by Cooper's counsel and asked to review materials and render opinions. Their opinions were pure expert opinions, not a mixed fact and opinion causation determination reached by a treating physician. Until contacted for litigation purposes, they had knowledge of no facts relevant to the case. Their knowledge was created only to assist in the litigation position of the defense.
Barring such evidence does not frustrate discovery on a central issue in the case, i.e. causation. Until these experts were hired by the defense, there was nothing to discover from them. See Stempler v. Speidell, 100 N.J. 368, 373, 495 A.2d 857 (1985) (establishing procedures for defense interviews of the plaintiff's treating doctors "as an aid to defendant's discovery"). Nor does barring their testimony withhold from the trier of fact reliable and probative evidence of the sort contemplated by the principles of privilege and waiver of *691 privilege. They possessed no knowledge sought to be held confidential until a privilege was waived.
The issue thus comes down to this: Should the membership of Drs. Clancy and Zimmerman in plaintiff's treatment group bar their selection and use by the defense as causation experts, either as testifying or consulting experts? To answer the question we weigh and balance the legitimate interests of the parties. We also consider the interest of the public and the judicial system in ascertaining the truth.
Cooper has a right to defend the claim of malpractice by its physicians. Part of its defense is to refute plaintiff's claim that if any of Cooper's doctors were negligent (which Cooper denies) that negligence did not cause plaintiff's injuries. Cooper has a legitimate need to engage the services of one or more well-qualified experts for this purpose. Cooper argues that it chose Drs. Clancy and Zimmerman because of their exemplary qualifications and because they are local. Cooper argues that the latter criteria is important so the jury does not perceive that it brought in "hired guns" from out of the area. Cooper has provided information showing that unlike the large neurology treatment group at CHOP, most hospitals in the South Jersey-Philadelphia area have few pediatric neurologists on staff. It therefore contends it would be prejudiced if it could not use CHOP physicians.
Like the defendants, plaintiff has a right to a fair trial. He must be prepared to meet adverse evidence presented by the defense, including expert opinion testimony by well-qualified experts. He argues that allowing Cooper to use as experts members of his treatment group will unnecessarily inject into the trial prejudice that will be difficult or impossible to overcome. Plaintiff also has a legitimate interest in preserving the loyalty and trust inherent in the physician-patient relationship he has established and maintained for nearly his entire life with Dr. Dlugos and other members of the CHOP neurology treatment team. He fears that the relationship will be detrimentally affected if members of the team are allowed to join the enemy camp as hired experts, engaged solely for the purpose of litigation.
Our primary analysis follows the precepts of N.J.R.E. 403, which provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of ... undue prejudice." In Stigliano, the Court turned aside the plaintiff's N.J.R.E. 403 argument. Stigliano, supra, 140 N.J. at 317-18, 658 A.2d 715. Although recognizing the negative impact to the plaintiff's case by allowing the treating doctors' adverse causation testimony, the Court found that the prejudice to plaintiff would not be unfair. Ibid. This was because the treating doctors, chosen by plaintiff, possessed knowledge gleaned from their examination and diagnosis for purposes of potential treatment. There was no unfairness in allowing that information, deemed factual in that context and developed at plaintiff's behest, to be presented to the factfinder in its search for the truth. The Court summed up its conclusion on the point by differentiating between treating physicians and retained experts:
Without impugning the expert witnesses who may testify for either plaintiffs or defendants, the treating doctors may be the only medical witnesses who have not been retained in anticipation of trial. A jury could find the treating doctors' testimony to be more impartial and credible than that of the retained experts. Excluding the treating doctors' testimony would undermine the ultimate objective of a trial, the determination of the truth. On balance, we find *692 that the probative value of the treating doctors' testimony outweighs any prejudice to plaintiffs.
[Ibid.]
The analysis leads us to a different conclusion in the circumstances before us. Drs. Clancy and Zimmerman have never individually been treating doctors for plaintiff. Nor were they consulted individually by plaintiff for purposes of rendering a diagnosis. Their testimony would not possess the inherent potential indicia of impartiality and credibility that attaches to that of a treating doctor, who, unlike a retained expert, accepts and undertakes the responsibility to treat and, to the extent possible, cure the patient. The probative value, therefore, diminishes significantly.
The prejudicial effect is substantial. Plaintiff will undoubtedly wish to drive home to the jury the excellent qualifications of his treating doctors and the CHOP neurology treatment team. In so doing, he will be forced to also bolster the qualifications of the intended defense experts. This will give the defense experts an inherent edge over plaintiff's experts. The jury will be told by senior members of plaintiff's treatment team with supervisory and managerial authority and teaching responsibility within the team that plaintiff's experts are wrong in their assessment of the cause of plaintiff's injuries. Drs. Clancy and Zimmerman are members of the treatment team chosen by plaintiff because of the superior qualifications of its members, practicing at a hospital chosen by plaintiff because it is renowned for treating seriously ill children. Based on their affiliation with plaintiff's chosen treatment team, jurors will undoubtedly give extra credit and weight to their testimony, in addition to that fairly based on their training and experience. Plaintiff has the burden of proof. Jurors might well wonder why they should be expected to find that the cause of plaintiff's injuries is that asserted by plaintiff's experts when senior members of plaintiff's chosen treatment team say otherwise.[3] This scenario would create an extra hurdle over which plaintiff would be required to climb to carry his burden of proof.
In addition to being substantial, this added prejudice to plaintiff is unnecessary. We reject Cooper's suggestion that the prejudice could be rectified by a curative instruction. There is no justification for injecting this prejudice into the case in the first instance. We are unpersuaded by Cooper's contention that it will be unfairly penalized because it will not be able to hire local experts outside the CHOP group. New Jersey contains within its borders and is surrounded in reasonably close proximity by many of the finest medical institutions in the country. It is a densely populated region with a high concentration of very well-qualified physicians in all fields.
We impute no improper motive to Cooper's attorneys in selecting Drs. Clancy and Zimmerman. However, the effect of that selection would be to create an unfair tactical advantage for the defense and concomitantly diminish plaintiff's right to a fair trial. See Lazorick, supra, 195 N.J.Super. at 449, 480 A.2d 223 (noting that "the purpose of the meeting [by defense counsel with a treating doctor] was *693 to investigate evidence, not create it"); Piller, supra, 194 N.J.Super. at 399, 476 A.2d 1279 (intended use by defense of treating doctor as a liability expert "may be a clever defense strategy, [but] its inherent prejudice substantially outweighs the probative value of [that doctor's] opinion on liability"). We conclude that under these circumstances the probative value of the testimony of Drs. Clancy and Zimmerman would be substantially outweighed by the risk of undue prejudice to plaintiff.
Secondarily, we agree with plaintiff that the use by the defense of these experts would have the capacity to adversely affect his physician-patient relationship with his treating physicians. A patient has a right to expect loyalty from his treating physician and should be able to place trust in that physician. Those qualities will likely be impaired if the defense were allowed to enlist members of plaintiff's treatment team in its litigation effort against plaintiff. We do not suggest that Drs. Clancy and Zimmerman have rendered opinions that reflect anything other than their honest and considered professional views. Nor is there reason to question the representations by Cooper's counsel that the doctors have based their opinions only on unprivileged materials properly obtained through discovery. However, as members of plaintiff's treatment group, Drs. Clancy and Zimmerman have full access to all of plaintiff's records, which might contain privileged information. They have the ability to discuss plaintiff's case as intra-group colleagues with Dr. Dlugos and other treating doctors in the group. Plaintiff and his parents should not have to be concerned about potential issues along these lines. Avoidance of this circumstance will also allow courts to avoid entanglement in potentially difficult discovery and disclosure issues. See, e.g., R. 4:10-2.
We conclude that plaintiff's legitimate interests substantially outweigh Cooper's. We further conclude that resolving this dispute in plaintiff's favor will not disserve the interest of the public and the judicial system in ascertaining the truth. No factual evidence will be withheld from the trier of fact. Both sides will have the full opportunity to present fact witnesses and well-qualified expert witnesses and argue their causes without the unfair influence that would result from Cooper's proposed use of Drs. Clancy and Zimmerman.
Affirmed.
NOTES
[1] We will refer to Hunter Carchidi DuBois, a minor, who was injured by the alleged malpractice, as the "plaintiff," although his mother and guardian ad litem, Catherine Kennedy Carchidi, is actually the plaintiff.
[2] CHOP is plaintiff's principal neurologic care provider, although he was also seen at duPont for several years.
[3] The record before us does not reveal any opinion by Dr. Dlugos regarding causation. Counsel for both sides advised us at oral argument that they do not know his position in that regard. He has not been deposed. Cooper anticipates that it will seek to interview him in accordance with the Stempler procedures, but it has not yet done so. Neither side would say whether it will call Dr. Dlugos as a witness. This uncertainty does not alter our determination of the issue before us.