# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5600-18

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.S.,

     Defendant-Appellant,

and

J.S.,

     Defendant.

_____

IN THE MATTER OF Jo.S.,
a minor.

_____

Submitted February 8, 2021 – Decided April 21, 2021

Before Judges Sabatino, Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0269-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Victor E. Ramos, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant N.S.[1] appeals from the May 4, 2018 order of the Family Part finding she abused and neglected her newborn child. The finding is based on expert testimony that N.S.'s illegal drug use during pregnancy caused the child to suffer from neonatal abstinence syndrome (NAS), commonly known as withdrawal, in the days after her birth. We affirm.

---

[1] We identify the parties by initials to protect confidential information in the record. R. 1:38-3(d)(12).

I.

The following facts are derived from the record. N.S. admits that she took heroin and non-prescribed Suboxone during her pregnancy, including on the day she gave birth to Jo.S. in 2017. The child immediately showed signs of respiratory distress and was admitted to the specialty care nursery of the hospital. Jo.S.'s treatment team placed her on a bubble CPAP, a device that provides continuous positive airway pressure, to open the child's breathing passages. They also contacted Dr. Julie Topsis, the consulting neonatologist on duty. Dr. Topsis arrived approximately two hours after the child was born and examined the child.

An x-ray showed that Jo.S. had small bilateral pneumothoraces, or areas where air pockets had formed between the lungs and the membranes around the lung. Dr. Topsis kept the child on CPAP for one to two hours before switching her to standard oxygen overnight. She spent several hours treating the child before leaving the hospital. A second x-ray taken a few hours after the first showed that the pneumothoraces had got much smaller, a sign of healing. By morning, the child no longer needed oxygen or other treatment for the pneumothoraces. There is no evidence in the record that neonatal pneumothoraces are related to maternal drug use.

A-5600-18

Both the mother and child tested positive for opioids. In addition, the newborn's meconium tested positive for buprenorphine, which has the trade name Suboxone. N.S. admitted purchasing Suboxone "on the street" and taking the drug while pregnant with Jo.S. in an attempt to self-treat her heroin addiction. She also acknowledged that she did not receive prenatal care.

In addition to treating Jo.S.'s pneumothoraces, medical staff monitored the newborn for symptoms of narcotics withdrawal using the Finnegan neonatal abstinence scale, a recognized tool for assessing NAS. Approximately twelve hours after her birth, the child's scores were in the three range, which indicates that medical intervention is not required. Her scores soon began to rise. She went from feeding well to not tolerating formula, gagging, spitting up, and biting when offered a bottle. In addition, the newborn's muscle tone increased, a sign of withdrawal, and she became irritable.

Starting at about fifty-one hours after birth, Jo.S. repeatedly received Finnegan scores of eight to thirteen, indicating a need for administration of morphine to treat NAS. She experienced loose stools, tremors, sneezing, yawning, and temperature instability, all symptoms of withdrawal. Staff administered gavage feeding, given through a tube inserted in Jo.S.'s stomach.

A-5600-18

Three days after Jo.S. was born, Dr. Topsis examined the child, reviewed her symptoms, determined them to be consistent with NAS, and initiated morphine sulfate treatment. Jo.S. responded well to the treatment, with her Finnegan score dropping to three that evening. Over the next week, all but two of the child's Finnegan scores fell between two and five. Her medical team gradually reduced her morphine dose, until discontinuing the medication three weeks after Jo.S. was born.

A hospital social worker contacted the Division of Child Protection and Permanency (DCPP or the Division) to report the positive test results for N.S. and Jo.S. and that N.S. brought non-prescription Suboxone into the hospital. Upon the child's discharge, DCPP conducted a Dodd removal.[2] Jo.S. was placed in a non-relative resource home for a short period, before being moved to the home of her paternal grandmother. After an investigation, the Division found that allegations of abuse and neglect of Jo.S. by N.S. were established.[3]

---

[2] A "Dodd removal" is an emergency removal of a child from parental custody without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

[3] DCPP's fact-finding order incorrectly states that abuse and neglect had been substantiated. See N.J.A.C. 3A:10-7.3(c)(1) and (2) (defining "established" and "substantiated"). This error is not material to the issues before the court.

A-5600-18

The Division filed a verified complaint against N.S. in the Family Part for care, custody, and supervision of Jo.S. pursuant to N.J.S.A. 9:6-8.21 and -8.73 and N.J.S.A. 30:4C-12.[4] The complaint alleged that N.S. abused and neglected Jo.S. through the ingestion of narcotics while pregnant. The court subsequently granted the Division custody of the child.

The trial court conducted a fact-finding hearing on the Division's abuse and neglect allegations. At the hearing, DCPP called one witness, a Division employee who supervised the investigation of N.S. During her testimony, DCPP sought to admit into evidence Jo.S.'s hospital records. The Division intended to have the witness identify the records and summarize the notes made by a case worker who observed Jo.S. while the child was hospitalized.

N.S. objected to the admission of medical opinions and diagnoses contained in the hospital records on hearsay grounds. She argued that although Rule 5:12-4(d) and N.J.R.E. 803(c)(6) allow for the admission of business records containing hearsay, the medical opinions and diagnoses in Jo.S.'s hospital records were too complex, under N.J.R.E. 808, to allow for their admission in the absence of testimony by the experts who offered those opinions

---

[4] The child's father, J.S., was also named in the complaint. He did not participate in the trial court proceedings or this appeal.

and diagnoses. DCPP argued that NAS was not a complex diagnosis and the opinions in the hospital records were sufficiently trustworthy to warrant their admission under Rules 803(c)(6) and 808.

The trial court found that the hospital records were admissible business records under Rule 803(c)(6). However, the court reserved on whether the medical opinions and diagnoses set forth in the hospital records were admissible. After the Division presented its witness, N.S. rested without calling a witness.

The trial court thereafter issued an oral opinion sustaining the objection. The court found that its review of Jo.S.'s hospital records revealed that many of the handwritten entries were illegible. In addition, the records refer to Finnegan scores, but contain no explanation of those scores or how they relate to NAS. As a result, the court found, in the absence of expert testimony deciphering the illegible entries and explaining Finnegan scores, it could not determine the complexity of a diagnosis of NAS or the admissibility of the records under Rules 803(c)(6) and 808.

DCPP moved to reopen the hearing to present the necessary expert testimony. The law guardian joined the Division's request. N.S. opposed the motion and moved for dismissal of the Division's complaint for failure to

A-5600-18

establish its allegations of abuse and neglect. The trial court granted the Division's motion and allowed all parties to obtain expert witnesses.

Four months later, the court continued the hearing. DCPP called Dr. Topsis as both a fact witness and expert. Dr. Topsis, who has twenty-nine years of experience treating newborns with NAS, during which she treated two to three thousand such patients, was qualified by the trial court as an expert in neonatology. She testified that it was her opinion within a reasonable degree of medical certainty that Jo.S. suffered neonatal pain requiring morphine and other symptoms from NAS as a result of N.S.'s ingestion of heroin and Suboxone during her pregnancy.

N.S.'s counsel cross-examined Dr. Topsis. The doctor conceded Jo.S. was born full-term at a healthy weight, both of which are unusual for children exposed to illicit drug use during pregnancy. She opined, however, that it is possible to have a full-term pregnancy and deliver a child of a healthy weight after abusing drugs.

N.S. called Dr. Loretta P. Finnegan, who created the Finnegan scoring system, as an expert witness in pediatrics with a sub-specialty in prenatal addiction and neonatal abstinence. Dr. Finnegan opined to a reasonable degree

of medical certainty that Jo.S. suffered neonatal pain and other symptoms as a result of her pneumothoraces and not as a result of NAS.

Dr. Finnegan acknowledged that sixty to eighty percent of heroin-exposed newborns suffer withdrawal. However, she noted that the onset of what was diagnosed as Jo.S.'s withdrawal symptoms was later than would be expected. She conceded the symptoms may have been delayed by the pneumothoraces and the treatment for that condition. Dr. Finnegan testified that Dr. Topsis applied a modified Finnegan scoring system, about which Dr. Finnegan had previously been unaware. She opined that use of a modified scoring system was inappropriate and that Dr. Topsis should have weaned the child off morphine sooner than she did.

On May 4, 2018, the trial court issued an oral opinion. The court carefully detailed the testimony of both experts before concluding that Dr. Topsis offered the more credible opinion with respect to Jo.S.'s diagnosis. The court noted that Dr. Topsis treated Jo.S., was present with the child to monitor her symptoms, and was aware of N.S.'s admissions regarding drug use, including her ingestion of heroin on the day she gave birth to Jo.S. The court concluded Dr. Topsis was in the superior position to diagnose Jo.S.'s medical condition and that her opinion was more consistent with the undisputed facts in the record.

A-5600-18

Having concluded that Jo.S. suffered from NAS following her birth, the court found that the Division had established by a preponderance of the evidence that N.S. abused and neglected Jo.S. under N.J.S.A. 9:6-8.21(c)(4)(b). The court found N.S. failed to exercise a minimum degree of care, which caused Jo.S. to suffer harm (the symptoms of NAS) and exposed the child to the substantial risk of harm. A May 4, 2018 order memorializes the court's decision.[5]

This appeal follows. N.S. raises two points: (1) the trial court erred by granting DCPP's motion to reopen the fact finding hearing; and (2) Dr. Topsis's expert opinion was in part, a net opinion and in part, based on flawed methodology. The law guardian supports the trial court's order.

## II.

A trial court's decision to reopen the record for additional testimony is reviewed for an abuse of discretion. N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 390 (App. Div. 2016); Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 281, 284-285 (App. Div. 1998). An abuse of discretion occurs when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible

---

[5] On July 12, 2019, the court entered an order terminating the Title 9 proceedings because DCPP had filed a complaint seeking to terminate N.S.'s parental rights to Jo.S.

basis."  Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quotation omitted).  "Under this standard, 'an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'"  Hanisko v. Billy Casper Golf Mgmt., Inc., 437 N.J. Super. 349, 362 (App. Div. 2014) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

In addition, the "ultimate objective of a trial" is "the determination of the truth."  Carchidi v. Iavicoli, 412 N.J. Super. 374, 386 (App. Div. 2009).  "[W]hen the ends of justice will be served by a reopening, it ought to be done."  State v. Wolf, 44 N.J. 176, 191 (1965).

In light of these standards, we are not persuaded by N.S.'s argument that the trial court abused its discretion when it reopened the fact finding hearing. After both parties rested, the trial court reserved on N.S.'s objection to the admission of Jo.S.'s hospital records.  In order to decide N.S.'s motion, it was necessary for the trial court to review the hospital records to determine if they contained a complex medical opinion or diagnosis and met the other requirements for admission without a witness set forth in N.J.R.E. 808.  See N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 173 (App. Div.

2012) (citing <u>N.J. Div. of Youth & Family Servs. v. B.M.</u>, 413 N.J. Super. 118, 129 (App. Div. 2010)).

The court's review of the records revealed handwritten entries that were illegible and references to an NAS assessment system that required explanatory testimony from an expert. The court acted well within its discretion when it reopened the hearing to allow the parties to present expert testimony. The court has an overriding obligation to act in Jo.S.'s best interests. The allegations against N.S. concern the child's safety and well-being. Given its inability to decipher the hospital records without expert testimony, the court appropriately allowed for the submission of the proofs necessary to fulfill its obligation to determine the validity of the Division's allegations.

The court ensured that N.S. was given a meaningful opportunity to defend herself at the reopened hearing. She presented an expert witness who opined that Jo.S. did not suffer from NAS. In addition, her counsel cross-examined the Division's expert witness, addressing several perceived flaws in her opinion. N.S. suffered no harm as a result of the hearing's reopening.

We also reject N.S.'s challenge to the trial court's finding that she abused and neglected Jo.S. We defer to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters," <u>Cesare v. Cesare</u>,

154 N.J. 394, 413 (1998), their "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand[,] [and their] feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 101 (2006)). Fact-finding that is supported by "substantial credible evidence in the record" is upheld. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of No. Amer., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

The "main focus" of Title Nine, of which N.J.S.A. 9:6-8.21(c)(4)(b) is a part, is "the protection of children." Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 177 (1999)). Under Title Nine, a child is "[a]bused or neglected" when their

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [a] parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted

13

harm, or substantial risk thereof . . . or by any other acts of a similarly serious nature requiring the aid of the court . . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

Minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. More is required than ordinary negligence, but less is needed than an intentional infliction of injury. Ibid. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

"Drug use during pregnancy, in and of itself, does not constitute a harm to the child under N.J.S.A. 30:4-C15.1(a)(1)." In re Guardianship of K.H.O., 161 N.J. 337, 349 (1999). To establish abuse or neglect the Division must prove that the mother's drug use caused actual harm, imminent danger, or a substantial risk of harm to the child. N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 22-23 (2013). Actual harm to a newborn can be shown by a number of factors, such as "respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through an extended hospital stay, lethargy, convulsions, or tremors." Ibid.

Proof of harm can come from any number of competent sources, including "medical and hospital records, healthcare providers, caregivers, or qualified experts." Ibid. The trial court has the authority to weigh and evaluate expert's testimony. New Jersey Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013). It is within the court's discretion to accept parts of a witness's testimony, while rejecting others. E&H Steel v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29 (App. Div. 2018); Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002).

An expert must "identify the factual basis for their conclusions, explain their methodology, and demonstrate that both the factual basis and the methodology are reliable." Townsend v. Pierre, 221 N.J. 36, 55 (2016). The expert must "give the why and wherefore" of his or her opinion. Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). In other words, an opinion consisting of "bare conclusions" or speculative hypotheses "unsupported by factual evidence" is inadmissible. Rosenberg v. Travorath, 352 N.J. Super. 385, 401 (App. Div. 2002).

"The weight to be given to the evidence of experts is within the competence of the fact-finder." LaBracio Family P'ship v. 1239 Roosevelt Ave.,

Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). A reviewing court should "defer to the trial court's assessment of expert evaluations." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 221 (App. Div. 2013).

There is ample support in the record for the trial court's finding that the expert opinion offered by Dr. Topsis is more credible than that offered by Dr. Finnegan. Dr. Topsis, who treated Jo.S. in the days after her birth, explained in detail the basis of her conclusion that the child suffered from NAS as a result of N.S.'s illicit drug use during pregnancy. The trial court had the opportunity to evaluate the live testimony of both experts and to make credibility determinations.

We disagree with N.S.'s argument that Dr. Topsis offered in part, a net opinion. The doctor relied on the hospital records, which included the child's scores on the Finnegan scale and the details of her symptoms, the mother's admission of long-term drug use during pregnancy, including ingestion of heroin shortly before giving birth, and her first-hand observations of the child while she was hospitalized. She drew on her decades-long experience to conclude that the child suffered from NAS. We have identified no basis to reverse the trial court's adoption of Dr. Topsis's opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5600-18