43 A.3d 1211 (2012)
426 N.J. Super. 167
In re PELVIC MESH/GYNECARE LITIGATION.
No. A-5685-10T4
Superior Court of New Jersey, Appellate Division.
Argued March 26, 2012.
Decided June 1, 2012.
*1212 Kelly S. Crawford, Morristown, argued the cause for appellants Ethicon, Inc. and Johnson & Johnson (Riker Danzig Scherer *1213 Hyland & Perretti, L.L.P., attorneys; Ms. Crawford, on the brief).
Adam M. Slater, Roseland, argued the cause for respondent Marci Levin (Mazie Slater Katz & Freeman, L.L.C., attorneys; Mr. Slater, of counsel and on the brief).
McCarter & English, L.L.P., attorneys for amicus curiae Product Liability Advisory Council, Inc. (David R. Kott, of counsel and on the brief; Gary R. Tulp, Newark, on the brief).
Gibbons P.C., attorneys for amicus curiae New Jersey Lawsuit Reform Alliance (Patrick C. Dunican, Jr., Newark, on the brief).
Before Judges A.A. RODRÍGUEZ, SABATINO and ASHRAFI.
The opinion of the court was delivered by
ASHRAFI, J.A.D.
Several hundred plaintiffs from many states have individually filed suit in New Jersey against defendants Johnson & Johnson and Ethicon, Inc., alleging they have suffered injuries caused by a line of defendants' medical products. The Supreme Court assigned the cases to the Law Division, Atlantic County, for joint case management. Subsequently, we granted defendants leave to appeal from the Law Division's May 26, 2011 pretrial order barring defendants from consulting with or retaining as an expert witness any physician who has at any time treated one or more of the plaintiffs. We now reverse that order.

I.
Johnson & Johnson and Ethicon, Inc. designed, manufactured, marketed, and sold pelvic mesh medical devices[1] used primarily to treat pelvic organ prolapse and stress urinary incontinence. The devices contain synthetic polypropylene mesh and are surgically implanted as a "vaginal sling" to support weakened vaginal walls.
In a Public Health Notification issued on October 20, 2008, the Food and Drug Administration warned healthcare practitioners about "serious" complications associated with transvaginal placement of surgical mesh, including mesh erosion, vaginal scarring, infection, pain, urinary problems, dyspareunia (painful sexual relations), recurrence of prolapse and incontinence, and perforation of bowel, bladder, and blood vessel during insertion.[2]
A few months earlier, in February 2008, the first of the plaintiffs in these New Jersey cases had filed suit against defendants alleging injuries sustained as a result of the surgical implantation of a pelvic mesh/Gynecare product. In October 2008, defendants retained as a consulting expert Halina Zyczynski, a physician from the University of Pittsburgh who specializes in obstetrics, gynecology, and urogynecology. From October to December 2008, four more pelvic mesh/Gynecare cases were filed against defendants in the Law Division.
In March 2009, defendants retained as a consulting expert Elizabeth Kavaler, a urologist from New York City. For the next several months, defense counsel consulted with Dr. Kavaler about the approximately thirty cases that had been filed by that time. In October 2009, while reviewing *1214 medical records of a plaintiff who had filed suit two months earlier, defense counsel discovered that Dr. Kavaler had surgically implanted a Gynecare product in treatment of that plaintiff. Defense counsel immediately informed plaintiffs' liaison counsel and advised Dr. Kavaler not to disclose to the defense any information about the plaintiff she had treated. Defense counsel then discontinued discussions with Dr. Kavaler pending determination of her eligibility to serve as a defense expert. Later, the plaintiff who had been treated by Dr. Kavaler testified in deposition that she stopped seeing Dr. Kavaler in July 2008, that is, some eight months before defendants first engaged her services as an expert.
Defense counsel identified another prospective expert and scheduled an introductory meeting for January 2010. When defense counsel learned that the prospective expert was the treating surgeon for another plaintiff in the litigation, defendants abandoned their intent to retain the proposed expert.
In September 2010, while reviewing medical records of a plaintiff who had filed suit nine months earlier, defense counsel discovered a largely illegible handwritten progress note with a reference to a "Dr. Zcycysky." The plaintiff had not identified a doctor by that name in her preliminary disclosures of treating physicians. Plaintiffs' counsel confirmed that the reference in the progress note was to a single consultation that the plaintiff had with defendants' expert Halina Zyczynski. Defense counsel informed plaintiffs' counsel in October 2010 that defendants had retained Dr. Zyczynski as a consultant in 2008, advised Dr. Zyczynski that a patient with whom she had consulted was now a plaintiff in the litigation, and discontinued their discussions with Dr. Zyczynski.
At the time of the Supreme Court's September 13, 2010 order assigning the cases for joint case management, approximately seventy-eight pelvic mesh cases had been filed in New Jersey against defendants. The same attorneys represent the parties in many of the cases. The Supreme Court's order allows one judge in the State to become closely familiar with the cases and to coordinate discovery, motion practice, settlement discussions, and scheduling of initial representative trials.
In January 2011, defendants moved to establish a protocol similar to ones used in some federal litigation for consulting with and possibly retaining as defense experts physicians who had treated a plaintiff in the pelvic mesh litigation. Defendants proposed that a treating physician would have no communication with the defense about his or her own patient-plaintiff and would not be used as an expert witness in the patient-plaintiff's own case.[3]
*1215 In support of their motion for a protocol and order, defendants submitted a certification stating:
The pelvic floor repair and incontinence "sling" surgeries at issue in this litigation are performed by a relatively small group of surgeons in the United States, which is comprised of urogynecologists, urologists, gynecologists and obstetrician/gynecologists. While it is impossible to determine precisely how many surgeons use mesh products in general, or even the products at issue in this litigation, Ethicon estimates that the number of surgeons who use the Gynecare pelvic floor repair products (such as Gynemesh PS and Prolift) is between 1,000 and 2,000, and the number who use the Gynecare TVT family of products is between 1,500 and 3,000. Given that many surgeons use both types of products, these numbers likely overlap to a significant extent.
Defense counsel also represented that in ten of the eighteen pelvic mesh cases for which counsel had received medical records, the plaintiffs appeared "to have ceased their physician-patient relationships with the surgeons who implanted the devices at issue."
Plaintiffs' counsel opposed the motion and cross-moved for a protective order barring defendants from retaining or consulting with any physician who at any time had treated any of the plaintiffs in the pelvic mesh litigation.
The trial court ordered plaintiffs to prepare a list of their treating gynecologists, urologists, and urogynecologists. The court also ordered defendants to submit, ex parte and under seal, estimates of the number of physicians currently using or trained to use the defendants' pelvic mesh products and information about defendants' consultations with Drs. Zyczynski and Kavaler.
After the parties provided the additional information, the court issued an order and written decision dated May 26, 2011, barring defendants from consulting with or retaining any physician who had at any time treated any plaintiff in the pelvic mesh litigation as identified in plaintiffs' list. At the time of the court's order, the number of plaintiffs had risen to more than 220. Defendants estimated that more than 1,000 physicians were thus disqualified as potential defense experts. According to defendants and amici curiae, the list of plaintiffs and their treating or consulting physicians has grown steadily while this appeal has been pending. At the time appellate briefs were filed in December 2011, the list numbered about 450 plaintiffs and about 1,300 physicians.
The trial court's decision also barred defendants from further engagement of Drs. Zyczynski and Kavaler as defense experts. In response to defendants' argument that any new defense expert would also face potential disqualification as new plaintiffs file suit, the court stated that *1216 defendants could move in the future to exempt a physician from the disqualification order. The court also stated it would consider modifying its order more generally if future events reveal that defendants are unable to retain satisfactory expert assistance in this litigation.
We granted defendants' motion for leave to appeal, and we subsequently stayed discovery to the extent it applies to defense experts.

II.
We emphasize at the outset that defendants do not seek to employ any treating physician as an expert witness in his or her own patient's individual case. We have not been asked to decide whether a current or past treating physician can under any circumstances be retained as an expert witness or consultant for the defense in a patient-plaintiff's own case. Compare Piller v. Kovarsky, 194 N.J.Super. 392, 399, 476 A.2d 1279 (Law Div. 1984) (treating physician was precluded from testifying as a liability expert against patient-plaintiff's claims in medical malpractice action); Serrano v. Levitsky, 215 N.J.Super. 454, 460, 521 A.2d 1377 (Law Div.1986) (defendant could not make use at trial of opinion in treating physician's report that defendant-doctor did not commit malpractice) with Kurdek v. W. Orange Bd. of Educ., 222 N.J.Super. 218, 226, 536 A.2d 332 (Law Div.1987) (treating physician was permitted to testify on behalf of the defendant that patient-plaintiff's injury was not permanent); Cogdell v. Brown, 220 N.J.Super. 330, 334, 531 A.2d 1379 (Law Div.1987) (in malpractice action, plaintiff was permitted to call as an expert witness a non-treating physician who was originally retained as an expert by defendant doctor).
In this appeal, defendants and amici curiae argue that the May 26, 2011 disqualification and protective order profoundly impairs defendants' ability to defend these lawsuits because it prevents them from employing qualified experts in cases against plaintiffs other than their own current or past patients. They say that the surgeons and other specialists in the United States who have experience with defendants' pelvic mesh products are best qualified to provide vital information and testimony as experts on the use of defendants' products, but those same physicians are also likely to have treated or consulted with a patient who is now a plaintiff or in the future may become a plaintiff in this jointly-managed, multi-plaintiff litigation.
According to defendants, not only does the order severely limit the pool of qualified and willing physicians that defendants can consult and engage as expert witnesses but it places defendants in the precarious position of consulting and preparing experts only to have them later disqualified as new plaintiffs are added to the litigation, as already occurred with Drs. Zyczynski and Kavaler. Defendants contend the court's order will force them to rely on physicians who have less direct patient experience and knowledge of their pelvic mesh products, or perhaps experts who do not practice medicine in the United States. On the other hand, plaintiffs will have the advantage of consulting with and presenting testimony at trial from American physicians who have treated patients and are personally familiar with the use of defendants' pelvic mesh products.

A.
One of the reasons the trial court gave for its disqualification and protective order was that employment of a treating physician as a defense expert "could interfere with the doctor-patient privilege." But the physician-patient privilege, N.J.R.E. 506; N.J.S.A. 2A:84A-22.1 to -22.7, *1217 has limited significance in this dispute.[4] Because plaintiffs have filed suit, they have waived a claim of privilege with respect to any medical condition relevant to their claims. Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 311, 658 A.2d 715 (1995); Stempler v. Speidell, 100 N.J. 368, 373, 495 A.2d 857 (1985); see N.J.R.E. 506; N.J.S.A. 2A:84A-22.4.
A plaintiff in these cases cannot claim the privilege as to the diagnosis and treatment of her medical condition that is the subject of the lawsuit, and a treating physician can be compelled to testify as a fact witness regarding those subjects, including the doctor's determination of the cause of the plaintiff's disorder. Stigliano, supra, 140 N.J. at 314, 658 A.2d 715; Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 32-33, 678 A.2d 271 (App. Div.1996); see Hague v. Williams, 37 N.J. 328, 336, 181 A.2d 345 (1962); Spedick v. Murphy, 266 N.J.Super. 573, 592, 630 A.2d 355 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993).
In Stempler, supra, 100 N.J. at 373, 495 A.2d 857, which the trial court cited as supporting its ruling, the Supreme Court acknowledged that the physician-patient privilege may extend only to "those elements of [plaintiff's] prior medical history that are not relevant to the litigation." Here, the treating physicians that defendants seek as experts are gynecologists, urologist, and urogynecologists. The treatment and consultations provided by those specialists most likely involved only medical conditions that are relevant to plaintiffs' claims of injuries in this litigation, including the medical history that was provided to the specialists. If treating physicians have knowledge of a plaintiff's medical history or condition that is irrelevant to this litigation, the privilege can be protected by defendants' proposed protocol against disclosure of patient-plaintiff specific information.
Doctors can be expected to understand they are subject to ethical constraints against disclosure of confidential patient information. See id. at 375, 495 A.2d 857 (citing Principles of Med. Ethics § 9 (Am. Med. Ass'n 1957)). Moreover, the order proposed by defense counsel, see Proposed Order, supra, note 3, would inform any potential physician-expert about the list of plaintiffs in this litigation and instruct the physician about the continuing confidentiality of patient information. As we will discuss later in this opinion, additional requirements in the protocol and order can further protect the interests of patient-plaintiffs against inadvertent disclosure of their confidential medical information.

B.
The key issue in this appeal is not whether the physician-patient privilege prevents engagement of a treating physician as an expert for the defense. The issue is whether some other rule or judicial or public policy categorically bars a treating physician from serving as an expert witness against the "litigation interests" of his or her patient, although in a different plaintiff's case.
The trial court held that jointly coordinated litigation requires an exception from the reasoning of Stempler, which allows defense access to treating physicians. The court agreed with plaintiffs that the defense may not privately consult and may not engage the services of any physician if the physician has at any time treated any plaintiff in this litigation. Although the trial court's order made reference only to *1218 treating physicians, its ruling disqualifying Dr. Zyczynski indicates that even a single consultation with a plaintiff will prevent the defense from consulting with or engaging a physician as an expert against the claims of other plaintiffs.
We conclude that the court's ruling was a mistaken exercise of authority to manage this litigation. It inappropriately equated a plaintiff's "litigation interests" with a patient's "medical interests," and it elevated those "litigation interests" to a preemptive level not previously recognized by binding authority. It imposed sweeping restrictions upon physicians that allow litigation instituted by a current or former patient to interfere with the physician's professional judgment about the medical interests of all the physician's patients. Moreover, it deprived defendants of fair access to physicians who could be among the best-qualified experts in these cases.
The trial court expressed a belief that a physician is ethically or legally obligated to ensure the continuing trust of a patient who has brought a lawsuit. The court stated that defense employment of physicians who have treated any plaintiffs in this coordinated litigation might impede effective medical treatment and erode trust between patients and their doctors.
We note initially that the trial court's concerns about medical treatment and erosion of trust do not apply to a physician whose treatment of or consultation with a patient-plaintiff has ended, although that physician must continue to maintain the physician-patient privilege where required. The court disqualified Dr. Kavaler from serving as a defense expert although her surgical treatment of a plaintiff had ended some eight months before she was retained as a defense expert. Dr. Zyczynski was disqualified despite only one past consultation with a patient-plaintiff. Defense counsel represented that many treating physicians were no longer treating patient-plaintiffs in this litigation. We see no significant issue of impeding treatment or eroding patient trust in a doctor who is no longer treating a patient-plaintiff.
Second, in many types of personal injury cases, physicians who testify for the defense or consult with defense counsel provide those services contrary to the interests in litigation of other patients they have treated or continue to treat. For example, radiologists, orthopedists, and neurologists who routinely testify as experts for the defense in numerous personal injury cases in our courts are likely to be treating or consulting physicians for other patients with similar injuries, and some of those patients may also have filed lawsuits or may do so in the future. Our system of civil justice does not bar a physician from expressing a position in litigation of one plaintiff that is contrary to the "litigation interests" of a current or past patient in another case. In fact, it is the physician's experience with similar injuries or conditions that qualifies him or her to provide expert opinions for the defense in a personal injury case.
Defendants committed to using their experts only as witnesses against plaintiffs that they had never treated and generally as consultants with respect to the nature and use of defendants' products. With appropriate sensitivity to physician-patient confidentiality, defendants proposed a protocol and protective order that barred the expert from assisting the defense regarding a patient-plaintiff's specific medical condition. The trial court, however, accorded little weight to defendants' commitment and proposal because this litigation involves joint case management.
The court agreed with plaintiffs that, in mass tort or coordinated litigation assigned for centralized case management under Rule 4:38A, the expert's ability to consult with defendants provides an unfair *1219 litigation advantage to the defense. Plaintiffs argue that the same issues of alleged product defect and causation will be disputed in all plaintiffs' cases. They also argue that information revealed to defense counsel about the expert's treatment practices and methods will also apply to the treatment of plaintiffs who were the expert's own patients.
Issues of product defect or safety, however, or the causes of common injuries and conditions of plaintiffs are not dependent upon the physician's knowledge of a particular patient's medical history or condition. Defendants seek to use the most qualified specialists to testify about their products and their experience with a multitude of patients, not about the medical condition of any particular plaintiff they have treated. Furthermore, a physician's practices or methods in treating a patient-plaintiff are not privileged information and are accessible to the defense under Stigliano, supra, 140 N.J. at 307, 314, 658 A.2d 715, and Stempler, supra, 100 N.J. at 382, 495 A.2d 857.
Plaintiffs' argument does not give adequate consideration to binding Supreme Court and Appellate Division authority on the subject of defense access to and use of relevant information from treating physicians. The trial court's decision did not make specific reference to the holding of Stigliano, supra, 140 N.J. at 307, 314, 658 A.2d 715, that the defense in a medical malpractice or product liability lawsuit may present causation testimony adverse to a plaintiff even if that testimony comes from the patient-plaintiff's own treating physician. See also Spedick, supra, 266 N.J.Super. at 592, 630 A.2d 355 (testimony of treating physicians as to their diagnoses of the plaintiff's injuries should not be barred because such a judicial policy "would only serve to hinder the search for truth").
In Stigliano, supra, 140 N.J. at 308, 658 A.2d 715, the parents of the infant plaintiff had received opinions from three treating physicians contrary to their claims that the defendant doctor and the defendant pharmaceutical company had caused the child's injuries and condition. The plaintiff did not dispute that the infant's physician-patient privilege had been waived by filing suit, and that the treating physicians could testify as fact witnesses regarding their diagnoses and treatment of the infant's condition. Id. at 312, 658 A.2d 715. On the plaintiff's motion, however, the trial court had barred the defendants from presenting opinion testimony of the treating physicians with respect to the cause of the infant's condition because that testimony would be "harmful to a patient's case" and would "unduly prejudice[]" her at trial. Id. at 309-10, 658 A.2d 715.
That reasoning is very similar to the trial court's reasoning in this case. The Supreme Court in Stigliano disagreed with that view and held that the adverse opinion testimony of the treating physicians about the cause of the infant's condition was not barred by either the physician-patient privilege or by N.J.R.E. 403 as unduly prejudicial. Id. at 312, 317, 658 A.2d 715.
The Court in Stigliano did not directly address the primary issue in this appeal that is, whether treating physicians may be engaged as expert witnesses for the defense against other plaintiffs with similar claims. However, it noted and distinguished those trial court opinionsPiller, supra, 194 N.J.Super. at 399, 476 A.2d 1279, and Serrano, supra, 215 N.J.Super. at 460, 521 A.2d 1377that had barred the use of treating physicians as defense experts in the patient-plaintiff's own case. Stigliano, supra, 140 N.J. at 314-15, 658 A.2d 715.
*1220 The Supreme Court also distinguished its own precedent on a related subject discussed in Graham v. Gielchinsky, 126 N.J. 361, 599 A.2d 149 (1991). Stigliano, supra, 140 N.J. at 312-13, 658 A.2d 715. In Graham, supra, 126 N.J. at 373, 599 A.2d 149, the Court had stated that an expert witness originally consulted by the plaintiff could not testify for the defendant unless exceptional circumstances were shown. The rationale for that restriction was to prevent interference with the ability and incentive of plaintiffs' counsel to consult privately with experts. Ibid.; Stigliano, supra, 140 N.J. at 313, 658 A.2d 715. That rationale does not apply to treating physicians that plaintiffs in this litigation did not consult as potential expert witnesses. Moreover, the discussion of exceptional circumstances in Graham and Stigliano was in the context of adverse testimony in the patient-plaintiff's own case, not cases involving other plaintiffs.
In fact, the Supreme Court has not barred outright the ability of one party in litigation to take advantage of adverse opinions of another party's professional expert because of prior contacts and consultations. In a case that did not involve medical injuries, the Supreme Court held that a party may call to the witness stand the other party's identified expert witness and elicit testimony adverse to the interests of the party that originally engaged the services of the expert. Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 302, 895 A.2d 405 (2006). The Court stated that identification of the expert as a potential witness constitutes a waiver of any privilege, ibid., and that "[a]bsent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance[,]" id. at 301, 895 A.2d 405 (quoting Cogdell, supra, 220 N.J.Super. at 335, 531 A.2d 1379); see also Moore v. Kantha, 312 N.J.Super. 365, 375-78, 711 A.2d 967 (App.Div.1998) (where identified defense expert was one of only a few physicians knowledgeable about experimental medication involved in plaintiff's malpractice claims, trial court did not err in permitting the plaintiff to offer in evidence de bene esse deposition testimony from the defendant's expert although the defendant chose not to use the expert as a witness at trial).
Here, the treating physicians are not confidential expert consultants whose services were engaged by plaintiffs' counsel for purposes of preparing litigation. See Stigliano, supra, 140 N.J. at 313, 658 A.2d 715. The identity of treating physicians and the fact that they possess relevant knowledge will be known to both sides as they are identified by plaintiffs and their medical records. As previously stated, the relatively insignificant risk in these cases that treating or consulting specialists may reveal privileged information if consulted or retained by the defense can be addressed through appropriate protective measures. The defense has proposed a protective order precluding those physicians from providing any information to the defense about their current or prior patient-plaintiffs.
Without reference to the holdings of Stigliano and Fitzgerald, the trial court cited Stempler, supra, 100 N.J. at 383, 495 A.2d 857, as establishing an exception from the proposition that the defense may discover and present the adverse testimony of a treating physician. The court characterized mass tort and coordinated litigation as "extreme cases" within the contemplation of Stempler, ibid., that justify restrictions on defense contact with treating physicians.
Stempler is not contrary to but supports granting an opportunity to defendants to make use of favorable testimony from treating physicians. In Stempler, the *1221 Court considered the competing interests of plaintiffs, defendants, physicians, and the public either in exposing or in protecting relevant information known by treating physicians, and the Court devised protections where defense counsel seek unrestricted access to that information. Id. at 380-83, 495 A.2d 857. The Court rejected the argument of the plaintiff that a patient's rights to confidentiality and the loyalty of his physician should be paramount. Id. at 381-82, 495 A.2d 857. It confirmed the right of defense counsel to interview treating physicians informally and outside the presence of plaintiffs or their attorneys if the treating physician consents. Id. at 382, 495 A.2d 857. In addition to recognizing the right of access to the doctor's relevant information, the Court noted that historically the physician-patient privilege has not been broadly applied, id. at 375, 495 A.2d 857, and that patients have only a "qualified" right of confidentiality in the physician's information, id. at 377, 495 A.2d 857.
As applied here, the Supreme Court's discussions of related issues in Stempler, Stigliano, and Fitzgerald support the position taken by defendants and amici that a treating physician is not categorically precluded by the physician-patient privilege, by other rules of evidence, or by case law from testifying adversely to a patient's interests in litigation, even if such testimony might erode the patient's trust in the physician.
Before the Supreme Court decided Stempler and Stigliano, this court's treatment of the issue was even more pronounced in Lazorick v. Brown, 195 N.J.Super. 444, 446, 449, 480 A.2d 223 (App.Div. 1984), a case involving a claim of medical malpractice where the treating physicians disagreed with the plaintiff's claims. Quoting Doe v. Eli Lilly & Co., Inc., 99 F.R.D. 126, 128 (D.D.C.1983), we stated: "As a general proposition ... no party to litigation has anything resembling a proprietary right to any witness's evidence." Lazorick, supra, 195 N.J.Super. at 454, 480 A.2d 223. We disagreed with the trial court's view that public policy barred a defense attorney from speaking privately and without permission to the treating physician. Instead, we stated: "The policy of the law is to allow all competent, relevant evidence to be produced, subject only to a limited number of privileges." Id. at 456, 480 A.2d 223; see also Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (stating "the fundamental principle that `the public ... has a right to every man's evidence'" (quoting United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 891 (1950))).
The precedents we have cited express a fundamental judicial policy in this State that a party may not deprive the opposing party of relevant information and testimony by bringing a lawsuit, or engaging an identified expert, and then claiming proprietary entitlement to information and opinions of knowledgeable witnesses. Rather, only recognized privileges and certain procedural protections are appropriate to control an opposing party's access to evidence from a potential witness.
Here, the physician's information that defendants seek to use is neither the particular diagnosis or condition of a patient that the physician treated nor the fruit of expert consultation to assess or prepare plaintiffs' claims. Rather, it is the physician's overall knowledge regarding the nature, use, risks, and safety of defendants' pelvic mesh products and the conditions that patients may experience as a result of their use. As defendants and amici persuasively argue, our mass tort procedures for managing coordinated litigation will unfairly hinder defendants' right to defend lawsuits such as these if plaintiffs as a *1222 group may engage as experts any qualified physicians with knowledge and experience but defendants may not. The fact that plaintiffs have filed suit in this State and taken advantage of our Rule 4:38A for joint case management should not affect the availability of relevant evidence to both sides. It should not preemptively limit defense access to the same pool of qualified witnesses and consultants knowledgeable about defendants' products as available to plaintiffs.[5]

C.
The trial court relied on our decision in Carchidi v. Iavicoli, 412 N.J.Super. 374, 990 A.2d 685 (App.Div.2010), and several decisions of other trial courts to conclude that a treating physician has a "duty of loyalty" to support a current or past patient's interests in litigation. We disavow any suggestion that a physician, or any witness for that matter, has a duty to support substantively a litigant's claims or defenses. The duty of a witness is to tell the truth when testifying and to provide information accurately in anticipation of testimony. No physician or other witness has a duty to support the "litigation interests" of a party to a lawsuit in the sense of supporting the party's claims or defenses.
We have found no authority for the contrary proposition urged by plaintiffs. Plaintiffs incorrectly cite Stempler, supra, 100 N.J. at 381, 495 A.2d 857, as establishing a treating physician's duty to "refuse affirmative assistance to the patient's antagonist in litigation." In Stempler, our Supreme Court made reference to such a statement derived from two older trial court opinions from other jurisdictions, Alexander v. Knight, 25 Pa. D. & C.2d 649, 654-55 (Pa.C.P.1961), aff'd o.b., 197 Pa.Super. 79, 177 A.2d 142 (1962), and Hammonds v. Aetna Casualty & Surety Co., 7 Ohio Misc. 25, 243 F.Supp. 793, 799 (N.D.Ohio 1965). But the Supreme Court's parenthetical recitation of statements in cited cases is not equivalent to adopting those statements as the law of this State. The Court's ultimate holding in Stempler, supra, 100 N.J. at 382, 495 A.2d 857that defense counsel may informally interview treating physicians leaves within the physician's discretion whether to cooperate with the defense.
Nor do the two cited trial court cases support the broad proposition advanced by plaintiffs as to a duty of loyalty. In Alexander, supra, 25 Pa. D. & C.2d at 655, the Pennsylvania Court of Common Pleas described as follows a treating physician's "duty of total care" to a patient-plaintiff: "a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation." Those remarks, however, were made in the context of the treating physician's failure to maintain the confidentiality of the patient's medical information without authorization to divulge that information. Ibid. Likewise, in Hammonds, supra, 243 F.Supp. at 795, 799, the federal court's similar remarks were made in response *1223 to an agent of an insurance company falsely telling a physician that his patient was contemplating a malpractice claim against him and thus inducing the physician to discontinue treatment of the patient and to divulge confidential information. In neither of those cases did the court state that a duty "to refuse affirmative assistance to the patient's antagonist in litigation" meant a duty to avoid substantive disagreement with the patient's claims in litigation. See Alexander, supra, 25 Pa. D. & C.2d at 655 ("The doctor, of course, owes a duty to conscience to speak the truth.").
In Piller, supra, 194 N.J.Super. at 399, 476 A.2d 1279, the trial court stated that "the fiduciary nature of the relationship" between a treating physician and the patient-plaintiff precludes the physician from testifying as a liability expert for the defense as to whether the defendant physician committed malpractice. But the court relied in part on application of the rules of evidence (the predecessor of N.J.R.E. 403), Piller, supra, 194 N.J.Super. at 399-400, 476 A.2d 1279, rather than solely on a physician's "duty of loyalty" to support substantively the patient-plaintiff's claims, id. at 397-98, 476 A.2d 1279. In Serrano, supra, 215 N.J.Super. at 460, 521 A.2d 1377, the trial court barred defense use of an opinion from the treating physician's report that the defendant doctor had not committed malpractice. The court stated that a treating physician owes a greater duty to his patient than the duty of "professional loyalty" to another physician in a malpractice lawsuit. Ibid. But the court's ruling was more a reaction to the unsolicited nature of the treating physician's opinion embedded in a medical record than with analysis of the right and opportunity of a physician to disagree substantively with a patient's claims in litigation.
Our opinion in Carchidi, supra, 412 N.J.Super. at 388, 990 A.2d 685, also made reference to a patient's "right to expect loyalty from his treating physician." We stated that expert testimony for the defense in a malpractice case by members of a patient-plaintiff's treatment group might "adversely affect his physician-patient relationship." Ibid. It is an incorrect reading of those statements, however, to impose a duty of loyalty upon a physician not to disagree with the patient's litigation position. Rather, as imposed by law, the physician's duties in litigation are to cooperate procedurally when called upon and to provide truthful information.

D.
The Code of Medical Ethics of the American Medical Association includes ethical standards applicable to a physician who becomes involved in a patient's lawsuit against another party. The Code states:
When a legal claim pertains to a patient the physician has treated, the physician must hold the patient's medical interests paramount, including the confidentiality of the patient's health information, unless the physician is authorized or legally compelled to disclose the information. [Code of Med. Ethics, Opinion 9.07 (Am. Med. Assoc. 2010-2011 ed.) (emphasis added).]
It states further:
When treating physicians are called upon to testify in matters that could adversely impact their patients' medical interests, they should decline to testify unless the patient consents or unless ordered to do so by legally constituted authority. If, as a result of legal proceedings, the patient and the physician are placed in adversarial positions it may be appropriate for a treating physician to transfer the care of the patient to another physician.
[Ibid. (emphasis added).]
*1224 The Code does not require that physicians avoid taking an adverse position to their patients' "litigation interests" but that they avoid adverse effects upon their patients' "medical interests." "Litigation interests" are not synonymous with "medical interests" of a patient. "Litigation interests" are established by attorneys or by the patients themselves. Those interests are not identified by medical professionals in the course of treatment.
Although the "medical interests" of a patient may be consistent or overlap with the patient's "litigation interests," such a determination should be made as a matter of professional judgment by the treating physician, not by the patient's lawyers, or by the courts applying wholesale rules of prohibition and disqualification. For example, it may be that in a particular case a plaintiff's interest in recovering a financial award to pay for future medical treatment overlaps with her "medical interests." Or perhaps, it may be that the plaintiff's psychological vindication through a lawsuit coincides with her "medical interests." But those determinations should not be made as a matter of judicial case management applicable to all treating physicians and all patients. A treating physician that defendants approach and solicit as a potential expert in this litigation may have to decide whether his or her honest assessment of the "medical interests" of a patient-plaintiff permits expert assistance and testimony adverse to her "litigation interests."
In making such a decision, the physician may also have to consider whether the "litigation interests" of one patient are consistent with or contrary to the "medical interests" of the physician's other patients. For instance, specialists in gynecology, urology, or urogynecology may disagree with the claims of plaintiffs in this litigation that defendants' products are defective and caused their injuries. Those specialists may believe that defendants' pelvic mesh products are not only safe but necessary or the most beneficial treatment for conditions suffered by their patients. They may believe that supporting the defense in this litigation will be beneficial to most of their patients. The trial court's order not only bars physicians from truthfully expressing opinions favorable to the defense but it may potentially harm the "medical interests" of other patients and interfere with the ability of physicians to provide the best available care for all their patients.[6]
Also, the Code of Medical Ethics does not expressly place constraints on the adverse participation of a treating physician in litigation if treatment of a patient has ended. Unless providing assistance to the defense harms the "medical interests" of a past patient in the intangible ways we have described, the physician's duties are tied only to maintaining the confidentiality of the patient's medical information unless disclosure is authorized.
In that regard, we note that our holding in Carchidi, supra, 412 N.J.Super. at 378, 388, 990 A.2d 685, entailed continuing, not past, treatment of the patient-plaintiff by the same treatment group as the defense experts. We applied N.J.R.E. 403 to the factual circumstances of that case and concluded that the plaintiff would suffer an *1225 unfair tactical trial disadvantage if the plaintiff's attorney was required at the same time to argue in support of the opinions of plaintiff's treating physicians while discrediting the opinions of more senior physicians within the same treatment group. Id. at 386, 990 A.2d 685. Here, no similar tactical disadvantage is forced upon plaintiffs because no defense expert would testify in the case of a plaintiff that the expert is treating, or in fact, has treated in the past.
When our courts have acted to prevent defendants from employing a treating physician as a defense expert, they have considered the particular prejudice to a plaintiff if the physician testifies in the plaintiff's own case. Id. at 386-87, 990 A.2d 685; Piller, supra, 194 N.J.Super. at 399-400, 476 A.2d 1279. Our decision today does not preclude similar individualized rulings in this litigation if specific facts demonstrate atypical prejudice visited upon a plaintiff if her treating physician is consulted as a defense expert or testifies in a different plaintiff's case.
In particular, we are uncertain what effect defendants' proposed protocol and protective order would have on the fact testimony of a defense expert as a treating physician in the patient-plaintiff's own case. Since defendants have agreed to maintain the confidentiality of the patient-plaintiff's medical information, we assume that defendants are also committing not to call their experts to testify on causation issues against their own patient-plaintiff, as permitted by Stigliano, supra, 140 N.J. at 314, 658 A.2d 715. We do not know, however, whether defendants have committed to forego such testimony if their expert is called to testify by the patient-plaintiff as her treating physician.[7]
We make no determination here regarding whether any protective measures are necessary to prevent the engagement of a treating physician as a defense expert from interfering with a plaintiff's access to the testimony of the same treating physician as a fact witness.[8] Rather than disqualifying as a group all treating physicians who ever treated any plaintiff, the trial court should address such concerns by allowing plaintiffs to demonstrate why a particular expert retained by defendants should not be permitted to testify or assist in the case of a different plaintiff. The fact that this litigation involves coordinated case management does not justify a broad finding of presumed prejudice to plaintiffs and the blanket disqualification of qualified physicians from providing assistance and testimony for the defense.
We have wide areas of agreement with our concurring colleague's discussion of the "inherent authority" of the court to prevent unfair prejudice to a particular plaintiff in a specific case. Post at 197, 43 A.3d at 1228-29. We note, however, that the federal decisions cited in the concurrence, post at 197-99, 43 A.3d at 1228-30, do not answer the issues before us because there has been no "switching sides" by a plaintiff's expert in this litigation and also *1226 because the federal decisions preceded our Supreme Court's differing view of the applicable law and policy as stated in Fitzgerald, supra, 186 N.J. at 301-02, 895 A.2d 405, namely, that an identified expert may be utilized by the opposing party.
Our point of divergence from the concurring opinion is the proper scope of inherent judicial authority to disqualify physicians as expert witnesses. We would grant the trial court less discretion than the concurrence seems to favor in deciding whether a physician has a duty to his or her patient that disqualifies the physician from serving as an expert in litigation. We think it beyond the scope of judicial authority to impose a "duty of loyalty" upon physicians to support, at least by enforced silence, a current or past patient's claims in litigation.[9]
In reaching that conclusion, we believe we have not decided "policy-laden issues," post at 201-02, 43 A.3d at 1231, except with respect to the courts' limited role. Our discussion is directed to allowing individual physicians, or their own profession, to decide the ethical issues presented by this appeal, rather than attorneys and their clients who are pursuing "litigation interests" and courts protecting those interests. We believe we have decided a single fundamental policy issue within the proper sphere of our judicial authority that courts should exercise restraint in determining what the substantive duties of physicians are to their patients who file lawsuits.

E.
In Stigliano, supra, 140 N.J. at 316, 658 A.2d 715, our Supreme Court considered and rejected a "fiduciary duty" imposed upon physicians to support their patients' claims in litigation, including by remaining silent. The Court was "disinclined to frustrate" the scope of the physician-patient privilege as developed by case authority "through a more restrictive interpretation of the fiduciary relationship between physician and patient." Ibid.
In Stempler, supra, 100 N.J. at 382, 495 A.2d 857, the Court devised procedural protections against the "inadvertent disclosure of information still protected by the privilege" if defendants and their attorneys are permitted to make direct, informal contact with treating physicians. The Court stated that the patient-plaintiff's authorization for such contact can be compelled, but that defense counsel should give notice of the time and place for an interview of a treating physician, the scope and nature of the subjects to be discussed, and clear information to the physician that his or her participation is voluntary. Ibid.
Considering these protections and the ethical duties of physicians as we have quoted from the Code of Medical Ethics, we think that some additional protections in the proposed protocol and protective order will serve to prevent misuse of a treating physician's services as a defense expert. First, counsel and the trial court should fix an appropriate time for plaintiffs' counsel to identify past or present treating or consulting physicians for any new plaintiff added to the litigation. Second, in accordance with Stempler, supra, 100 N.J. at 382, 495 A.2d 857, defense counsel should give notice to plaintiffs' counsel of their intent to contact any past or current treating or consulting physician for the purpose of exploring whether that *1227 physician might be engaged as a defense expert.
In accordance with our decision in this appeal, plaintiffs' counsel and patient-plaintiffs shall not suggest to treating or consulting physicians that any prohibition exists as to the physician's participation as an expert in this litigation for either side. Rather, all counsel, their agents, and their clients shall truthfully communicate the cautions and constraints regarding participation of a treating physician essentially as stated in the Memorandum to Physicians proposed by defendants and previously quoted in footnote 3 of this opinion. See ibid. Defense counsel shall also make clear to treating physicians that their informal participation in communications with defendants and their attorneys shall be entirely voluntary. Ibid.
Because defendants do not intend to retain any physician as an expert in the case of the physician's own past or current patient-plaintiffs, the defense shall not be obligated to give further notice to plaintiffs' counsel as to any physicians that the defense in fact interviews, consults, or retains, until required to do so by discovery rules and orders. However, in accordance with the Code of Medical Ethics, supra, Opinion 9.07, any physician who is retained or otherwise substantively consulted by the defense shall notify any current patient-plaintiffs of that engagement and provide to the patient the opportunity to transfer her care and treatment to a different physician.
The trial court shall hear any application by plaintiffs that the retention of a particular treating physician as a defense expert will unduly prejudice a patient-plaintiff, including for example, by interference with access to that physician as a fact witness. If plaintiffs make such a particularized showing, the court shall consider appropriate protective measures, including disqualification where lesser measures are not sufficient or feasible.
We do not mandate specific language for these additional protective measures but leave the task of drafting appropriate language for counsel and the trial court. Nor do we insist on adoption of all these provisions without amendment or deletion by consent of the parties. Our recommendations are suggested for counsel's and the court's consideration and may be modified upon further reflection.

III.
Contrary to binding precedents in this State and the Code of Medical Ethics, the trial court elevated a patient-plaintiff's "litigation interests" to an unprecedented level. A physician's ethical duty is to the "medical interests" of all the physician's patients. The "litigation interests" of a patient are not necessarily equivalent to the patient's "medical interests," and they do not define the physician's duties to all patients. Courts overstep their legitimate powers if they impose a duty of silence upon physicians to avoid taking substantive positions contrary to any patient's interests in litigation.
Both sides in this litigation should have the opportunity to present evidence from the most qualified physicians who can serve as experts. The trial court's order unfairly impeded defendants' access to many of those physicians, and so, must be reversed.
The partial stay of discovery granted by this court on April 4, 2012, is dissolved. We remand to the Law Division for further proceedings consistent with our opinion, including a revised discovery and scheduling order. We do not retain jurisdiction.
*1228 SABATINO, J.A.D., concurring in the reversal of the trial court's order.
I concur with my colleagues in overturning the May 26, 2011 case management order prohibiting defendants from retaining as experts all physicians who have treated any of the plaintiffs in this centralized litigation, but prefer to do so on a narrower basis. In particular, I would nullify the order pursuant to the principles underlying Rule 4:10-2(g) and Rule 4:10-3 because the blanket restrictions it imposes are overbroad and unduly burdensome upon the defense.
The principles that guide our courts in pretrial discovery matters, including the use of experts, strive to avoid placing undue burdens upon litigants or imposing unfair conditions upon access to relevant information or potential witnesses. See R. 4:10-2(g) (authorizing courts to limit discovery that is unduly burdensome and to consider whether a party "has had ample opportunity ... to obtain the information sought"); see also R. 4:10-3 (authorizing courts to enter discovery orders that "protect a party [ ] from ... undue burden or expense"). Although these principles typically come into play when there is an allegation that a discovery demand by an adversary is unduly burdensome or unfair, they logically also apply to the terms of a case management order that excessively limits a party's access to relevant information, witnesses, and professional advice.
Subject to certain procedural and evidentiary constraints, a litigant has a presumptive right to designate one or more expert witnesses that it may call upon at trial to render admissible opinions and, if the expert also has personal knowledge, facts relating to the case. See R. 4:17-4(d) (concerning the designation of experts); N.J.R.E. 702 (regarding the admissibility of expert testimony). A litigant within our adversarial system also has a presumptive right to engage, as consultants or advisers, experts who may not issue discoverable reports or testify in the matter, but who instead are retained to assist the litigant and its counsel in the prosecution or defense of the case. See, e.g., Franklin v. Milner, 150 N.J.Super. 456, 472, 375 A.2d 1244 (App.Div.1977); see also Pressler & Verniero, Current N.J. Court Rules, comment 5.2.1 on R. 4:10-2 (2012).[1]
Not all professionals are necessarily eligible, however, to serve as experts or consultants for a particular side in a lawsuit. As several federal cases have expressly recognized, "courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." Hewlett-Packard Co. v. EMC Corp., 330 F.Supp.2d 1087, 1092 (N.D.Cal.2004); see also Erickson v. Newmar Corp., 87 F.3d 298, 300 (9th Cir. 1996) (noting that courts may disqualify experts in possession of confidential information who "switch sides"); Koch Ref. Co. v. Jennifer L. Boudreaux M/V, 85 F.3d 1178, 1181 (5th Cir.1996) (noting the multi-part balancing test that courts employ to determine whether an expert who has not "switched sides" should be disqualified). "This power derives from the court's duty to preserve confidence in the fairness and integrity of judicial proceedings, and to protect privileges which may be breached if an expert is permitted to switch sides in pending litigation." United States ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc., 994 F.Supp. 244, 248-49 (D.N.J.1997) (internal citations omitted).
*1229 Our State's own case law has similarly recognized the Court's inherent authority to constrain the use of experts in certain situations. For example, in Graham v. Gielchinsky, 126 N.J. 361, 373, 599 A.2d 149 (1991), the Supreme Court held that, in the absence of exceptional circumstances, the courts "should not allow the opinion testimony of an expert originally consulted by an adversary." The expert in question in Graham was a physician who had examined the plaintiff at his attorney's request to evaluate whether the plaintiff's medical condition was caused by the defendant surgeon's deviation from the relevant standard of care. Id. at 364, 599 A.2d 149. Because the consulted physician concluded that the defendant had not deviated from the standard of care, plaintiff did not designate that physician as a testifying expert. Ibid. However, defense counsel learned of the physician's favorable evaluation and then designated him as an expert for the defendant. Ibid. The Supreme Court generally disallowed counsel in future cases from using such physicians as their experts at trial. Id. at 374, 599 A.2d 149. The Court noted that, under Rule 4:10-2(d)(3), unless exceptional circumstances are present, "the opinion evidence of an expert not expected to testify at trial cannot be discovered, much less admitted as evidence." Id. at 370-71, 599 A.2d 149.
The Court's authority to impose this restriction in Graham derived from principles of "trial-fairness." Id. at 373, 599 A.2d 149. The Court noted, as a matter of policy, that giving an adversary free rein to retain an expert who had been originally consulted by an opponent could result in him or her taking "unfair advantage" of the opposing lawyer's attempt to evaluate the client's case. Id. at 372-73, 599 A.2d 149. The Court in Graham recognized the importance of the search for truth at a trial, but determined that the search may be tempered by considerations of fairness and does not necessarily "trump[ ] all other policies of law." Id. at 371, 599 A.2d 149; see also Genovese v. N.J. Transit Rail Operations, Inc., 234 N.J.Super. 375, 381, 560 A.2d 1272 (App.Div.), certif. denied, 118 N.J. 195, 570 A.2d 960 (1989) (disallowing an adversary from substantively using at trial, over the objection of opposing counsel, the videotaped deposition testimony of an expert that the party did not intend to call as a trial witness). Although, as Judge Ashrafi's opinion rightly notes, the Court distinguished the situation in Stigliano from that in Graham, see Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 312-13, 658 A.2d 715 (1995), our courts' inherent authority to regulate these matters of expert involvement was not repudiated.
Case law also instructs, however, that the disqualification of an expert "is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." Hewlett-Packard, supra, 330 F.Supp.2d at 1092; see also, Koch, supra, 85 F.3d at 1181; Procter & Gamble Co. v. Haugen, 184 F.R.D. 410, 413 (D.Utah 1999). Such cases have stressed that a court's authority to disqualify experts is more limited than its authority to disqualify attorneys. See United States ex rel. Cherry Hill Convalescent Ctr., supra, 994 F.Supp. at 249; see also Hewlett-Packard, supra, 330 F.Supp.2d at 1092. The "expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than attorneys." English Feedlot, Inc. v. Norden Labs., Inc., 833 F.Supp. 1498, 1501 (D.Colo. 1993). "Experts are not advocates in the litigation but sources of information and opinions." Ibid.; see also Hewlett-Packard, supra, 330 F.Supp.2d at 1092; United States ex rel. Cherry Hill Convalescent Ctr., supra, 994 F.Supp. at 249; Great Lakes Dredge & Dock Co. v. Harnischfeger *1230 Corp., 734 F.Supp. 334, 338 (N.D.Ill. 1990).
Physicians, who sometimes serve in litigation as experts or consultants, sometimes as fact witnesses, and sometimes in both capacities, often serve as such "sources of information and opinions" relevant to a case. At times our courts have addressed the appropriate roles that such physicians can undertake when participating in the adversarial process. For example, despite the potential prejudice to a plaintiff, our case law permits defense counsel to call a plaintiff's treating physician as a fact witness and, ancillary to his or her factual testimony, render opinions about what caused the plaintiff's condition that the doctor had treated. Stigliano, supra, 140 N.J. at 314, 658 A.2d 715. The Supreme Court has also permitted defense counsel, subject to judicially-imposed constraints, to interview a plaintiff's treating physician before his or her deposition, unless the plaintiff shows that such an ex parte interview causes substantial prejudice under the circumstances of the case. Stempler v. Speidell, 100 N.J. 368, 380-83, 495 A.2d 857 (1985). These cases, as well as Graham, supra, 126 N.J. at 373-74, 599 A.2d 149, illustrate that a court may exercise its authority in supervising litigation to demarcate the appropriate boundaries, if any, of a physician's involvement.
Applying these principles here, it is manifest, even in light of our usual deference to trial courts on matters of case management, see, e.g., Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559, 691 A.2d 321 (1997), that the disqualification terms of the case management order before us unduly hamstring defendants in retaining qualified experts and consultants in this litigation. The overbreadth of the order and the undue burdens it places upon defendants have been magnified by the growth of Pelvic Mesh/Gynecare case filings. At the time the order was issued in May 2011, the number of plaintiffs exceeded 220 and more than 1000 physicians were disqualified. Since that time, the number of plaintiffs has more than doubled, resulting in the disqualification of approximately 1300 physicians. It is anticipated that plaintiffs may call as experts in their own respective cases-in-chief physicians who have actually implanted the devices and have had unfavorable experiences with them. The defense should have a reciprocal fair opportunity to utilize the expertise of other physicians who have used the products and who have contrary views about their efficacy, or who believe that problems their patients have experienced with the devices were not caused by the manufacturer. See Moore v. Kantha, 312 N.J.Super. 365, 377, 711 A.2d 967 (App.Div.1998) (noting the importance of a litigant being practicably able to obtain facts or opinions from an expert with experience in the "actual use" of a particular medical treatment).
The number of physicians who have actually implanted the Pelvic Mesh/Gynecare devices with frequency is apparently limited. Although the parties and the amici dispute the precision and significance of the statistics, it is incontrovertible that the pool of non-disqualified experts available to defendants is shrinking. Defendants are entitled to be "prepared to meet adverse evidence ... including expert opinion testimony by well-qualified experts." Carchidi v. Iavicoli, 412 N.J.Super. 374, 385, 990 A.2d 685 (App.Div.2010).
Although a litigant does not have "the absolute right to elicit testimony from any person [it] may desire," State v. Sanchez, 143 N.J. 273, 291, 670 A.2d 535 (1996), the trial court's order, particularly in light of the growth of the number of pending cases, restricts the defense far too much without ample justification. The order consequently must be set aside as a misapplication of the trial court's discretion. The terms of the order itself recognized *1231 that it could be subject to future revision. The time to do so has come.
Although I agree with two other important aspects of Judge Ashrafi's analysis, I do not think it is necessary or prudent to reach the additional grounds for reversal and other observations that are expressed in his opinion. The opinion explores and decides many difficult and important issues that are more broadly implicated by this appeal, such as the existence or extent of an enforceable "duty of loyalty" owed by a physician to a patient; the nature and potential overlap of a patient's "litigation" interests and "medical" interests; and the interests of physicians in freely expressing their opinions about the utility of a medical device.
These complex issues, which are at the crossroads of law, medicine, and ethics, have nuances and potential wide-ranging consequences that could affect more than the soundness of the case management order before us.[2] I suggest that those broader, policy-laden issues be reserved for future consideration, ultimately by the Supreme Court. The optimal resolution of the various interests involved may well entail a balancing approach rather than a bright-line approach, despite the less predictable nature of such a balancing test.[3] In any event, I would leave it to the Court to resolve more comprehensively what principles control and what particular standards should guide the bench and bar.[4]
That said, I do join in Judge Ashrafi's analysis on two significant points that should be underscored.
First, I discern no reason to preclude defendants from having access to a former treating physician of one or more of the plaintiffs as a potential expert. In Carchidi, supra, 412 N.J.Super. at 388, 990 A.2d 685, we recognized that "[a] patient has a *1232 right to expect loyalty from his treating physician and should be able to place trust in that physician." However, such an asserted "duty of loyalty" no longer can apply when the patient and physician have parted ways, except for, of course, the preservation of confidential medical information and any privileged discussions between that patient and that physician.[5]
The record is unclear whether revising the trial court's order to enable defendants to retain one or more of such former treating physicians as their experts will suffice to provide them with fair access to the most qualified opinion testimony. We do not have enough information before us to evaluate that question. It also may be unfair to defendants to disqualify a former treating physician that they have already retained as an expert if another patient of that same physician thereafter happens to file a lawsuit against the product manufacturer. The trial court should endeavor, on remand, to resolve these concerns equitably, in fashioning a revised and less-onerous order that does not deprive the defense of fair access to such potential experts, whether they are former or current treating physicians.
Second, to the extent that defense access to current treating physicians of plaintiffs as potential defense experts in this jointly-managed litigation may be warranted, I would emphasize the importance of timely and full disclosure to an ongoing patient that her physician wishes to serve in that capacity. See Stempler, supra, 100 N.J. at 382, 495 A.2d 857. Even if the defense does not intend to call such a physician as a witness and only retains him or her as an expert consultant, that consulting relationship should be disclosed to the patient. The patient might reasonably regard such a consulting arrangement for these inter-connected cases as injecting an element of antagonism into her own relationship with her physician and diminishing the trust that she reposes in that doctor. A patient so informed can then decide whether she wants to sever the relationship and find another doctor. If such a transfer of care demonstrably imposes an undue hardship upon the patient, the trial court may consider ordering appropriate relief, including the possible disqualification of the expert as an exceptional measure. See Carchidi, supra, 412 N.J. Super. at 386-88, 990 A.2d 685 (disallowing defendants' retention of medical experts who supervised plaintiff's ongoing treatment team at a hospital that plaintiff and her family specifically chose because of its renowned reputation for caring for seriously ill children). Similarly, as is envisioned in Part II(D) of Judge Ashrafi's opinion, the trial court may consider disqualifying a defense expert if his or her retention would unduly interfere with a plaintiff's access to her own treating physician as a potential witness.
I therefore join in the reversal of the trial court's overbroad and unduly-burdensome order. The matter should be remanded to allow the trial court, with the input of counsel, to fashion a more narrowly-drawn order that provides the defense with greater and fairer access to the pool of potential qualified experts.
NOTES
[1] Gynecare, Gynemesh®, PS/Prolift®, Prolift + M, and Gynecare TVT® products.
[2] Food and Drug Administration, Public Health Notification: Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence (2008), available at http://www.fda.gov/medical devices/safety/alertsandnotices/publichealth notifications/ucm061976.htm.
[3] Defendants proposed an Order Relating to Retention of Expert Witnesses, which provided:

Defendants are hereby permitted to retain as an expert witness any physician who is identified as a treating physician of a plaintiff in this litigation, subject to the following:
a. Defendants and their attorneys shall monitor whether the physician-expert has treated any of the plaintiffs;
b. Defendants and their attorneys shall not communicate with the physician-expert about any of his/her patients who are plaintiffs or are likely to become plaintiffs in this litigation;
c. Defendants and their attorneys shall not retain or use a treating physician as an expert in any case brought by a patient of the physician; and
d. Defendants and their attorneys, before having any substantive communication with a prospective physician-expert, shall provide the physician with a copy of this Order and secure the physician's written acknowledgement that he/she has read the attached Memorandum to Physicians (Exhibit 1 to this Order).
The Memorandum to Physicians referenced in the last paragraph stated:
Ethicon, Inc. and Johnson & Johnson ("Defendants") are permitted to retain as expert witnesses physicians who may have treated one or more patients who are Plaintiffs in this litigation. Despite their service as experts, these physicians are still bound by the physician-patient privilege and are forbidden from communicating with Defendants, their employees and their attorneys about their patients who are Plaintiffs, absent subpoena, their patients' written authorization, or another Order from the Court. Defendants and their representatives shall identify which of a physician's patients are Plaintiffs before any substantive communications begin. If a physician, at any time, believes that Defendants are attempting to communicate about a Plaintiff who is or was the patient of the physician, directly or indirectly, the physician should contact the below listed counsel for Defendants and Plaintiffs.
[4] The physician-patient privilege was not recognized under the common law of New Jersey and "is of relatively recent statutory origin." Stempler v. Speidell, 100 N.J. 368, 374, 495 A.2d 857 (1985) (citing L. 1968, c. 185 (codified at N.J.S.A. 2A:84A-22.1 to-22.7)).
[5] We are informed that only a small number of plaintiffs in this litigation have included malpractice claims in their complaints against the surgeons who implanted defendants' pelvic mesh products. Had many plaintiffs brought malpractice claims against treating physicians, there would be no question that the treating physicians who were sued could testify adversely to plaintiffs' "litigation interests" and assist the defense. If the trial court's ruling were to stand, plaintiffs in such coordinated litigation could bring suit in New Jersey only against defendant pharmaceutical companies and not against physicians, and thus shut off equal access to qualified physicians as witnesses because our court rules accommodate joint case management and because plaintiffs have chosen that litigation strategy.
[6] Whether physicians are compensated by defendants to serve as experts is not relevant to use of their services as consultants or the admissibility of their expert testimony. Plaintiffs' implication that physicians may be motivated by financial gain to color their opinions about the safety of defendants' products unjustifiably denigrates the medical profession as a whole. Plaintiffs' experts are also compensated, as are the lawyers in these cases. Both physicians and lawyers are bound by ethical duties of honesty and truthfulness. Furthermore, an expert's credibility may be addressed to the jury at trial, including by evidence about the expert's compensation.
[7] Under Fitzgerald, supra, 186 N.J. at 306, 895 A.2d 405, if a treating physician were to be called as a fact witness by a plaintiff, defendants could not reveal to the jury that they have retained that physician as their expert against other similarly-situated plaintiffs. There may be circumstances, however, where the jury learns about the expert's retention, ibid., for example, where plaintiff's trial attorney decides to reveal that information as relevant to the physician's credibility.
[8] For example, plaintiffs argue that Dr. Kavaler has not responded to their inquiries for information as the treating surgeon for one of the plaintiffs. Having earlier been retained as an expert by the defense and then been instructed not to consult further until the propriety of her retention is determined, Dr. Kavaler may be awaiting conclusive guidance from the court.
[9] Our decision makes it unnecessary for us to address defendants' further argument that the First Amendment rights of physicians were violated by the trial court's order of disqualification and preclusion.
[1] In this respect, the issues before us implicate not only a treating physician's "silence" as a potential witness, but also the extent to which the physician may engage in behind-the-scenes consulting to the defense.
[2] As just one example, there may be qualitative distinctions between the use of a treating physician as a fact witness, as in Stigliano, supra, 140 N.J. at 314, 658 A.2d 715, and the retention of a treating physician as a non-testifying consultant or as an expert hired solely to render opinion testimony. Unlike fact witnesses who may be compelled by subpoena to appear in court and divulge the information they possess, experts generally provide their opinion testimony on a voluntary basis and are not ordinarily compelled to devote their professional time and insight to a case if they do not wish to do so. See, e.g., Carter-Wallace, Inc. v. Otte, 474 F.2d 529, 536 (2d Cir.1972), cert. denied, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973) (noting that it is "not the usual practice" to subpoena an expert witness); cf. Code of Medical Ethics, Opinion 9.07 (Am. Med. Assoc. 2010-2011 ed.) (noting that "[w]hen treating physicians are called upon to testify in matters that could adversely impact their patients' medical interests, they should decline to testify unless the patient consents or unless ordered to do so by legally constituted authority" (emphasis added)).
[3] See, e.g., Kinsella v. Kinsella, 150 N.J. 276, 324, 696 A.2d 556 (1997) (applying a balancing test to resolve whether the psychologist-patient privilege should be overcome in a particular setting); Graham, supra, 126 N.J. at 365-74, 599 A.2d 149 (adopting an "exceptional circumstances" standard and referring the subject to the Civil Practice Committee "to evaluate evidence of the competing policy concerns that must be conjoined to produce a fair trial"); Stempler, supra, 100 N.J. at 382, 495 A.2d 857 (adopting a qualified procedure to accommodate the "competing interests" involved); Carchidi, supra, 412 N.J.Super. at 384-88, 990 A.2d 685 (noting that, in the circumstances presented, "plaintiff's legitimate interests substantially outweigh[ed]" those of the defendant).
[4] These difficult issues concerning a treating physician's relationship with a patient were not squarely resolved in Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 895 A.2d 405 (2006), which concerned a psychiatrist who apparently did not treat the plaintiff and who instead was initially consulted by the plaintiff, and then by the defense, to render expert opinions in the litigation. Id. at 296-306, 895 A.2d 405.
[5] Although there is no suggestion that it would be attempted here, plaintiffs who have ceased treating with a physician for a substantial period of time cannot be permitted to circumvent this principle by making new appointments with those physicians for the tactical purpose of depriving the defense of access to such experts.